KENNEDY ASSOCIATES, INC., Alaska Carpenters Retirement Plan, Alaska Hotel and Restaurant Employees Pension Trust, and Alaska Plumbing and Pipefitting Industry Pension Trust Fund, Appellants,

v.

Richard FISCHER, Appellee.

Nos. 6697, 6753.

Supreme Court of Alaska.

July 15, 1983.

J.L. McCarrey, III, and William Grant Stewart, McCarrey & McCarrey, Anchorage, for appellants.

M.P. Evans, Dickson, Evans & Esch, Anchorage, for appellee.

Before BURKE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and HODGES, Superior Court Judge.*

## OPINION

RABINOWITZ, Justice.

This appeal arises from a real estate loan agreement entered into by Kennedy Associates, Inc. (Kennedy), and Richard and Teri Fischer (Fischer). In March 1980, Kennedy, an investment advisor representing several pension trusts, issued a commitment to participate as lead lender in a long-term $1.25 million loan to Fischer on commercial rental property in Anchorage. Shortly thereafter, Kennedy notified the joint lender, Alaska Mutual Savings Bank (AMB), that it had decided not to participate in the project. Fischer and AMB refused to accept the withdrawal and Fischer filed suit for breach of contract. The superior court concluded that Kennedy was liable to Fischer on a theory of anticipatory repudiation. This appeal followed. We conclude that the superior court erred in holding that Kennedy was in breach of contract and therefore reverse.

I.

Fischer is an Anchorage real estate investor and developer. His holdings include the Anchorage Fish and Game Building, the subject of the instant litigation. It was constructed in 1971–72 for occupancy by the Alaska Department of Fish and Game. The original three-year lease has been extended several times and will expire July 31, 1985 unless Fish and Game exercises its renewal

---

* Hodges, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16, of the constitution of Alaska.

option and extends the lease through July 31, 1990.

On September 13, 1979, Fischer negotiated an amendment to the lease with Fish and Game which required him to construct an addition to the building. He obtained interim financing for the expansion from SeaFirst Mortgage Corporation and subsequently sought $1.5 million in long-term financing from AMB. He submitted a loan package to AMB comprised of a copy of the appraisal report on the property, which included sketches of the existing floor plan and preliminary plans and specifications for the addition, a financial statement, a copy of the leases on the building, and cash flow information.

AMB's representative, Paul Baker, approached a Kennedy loan officer, John Parker, with a proposal that several of the pension trusts which Kennedy represented as an investment advisor participate in the loan to Fischer. Baker forwarded the Fischer loan package to Parker on or about February 27, 1980, stating in the cover letter that AMB would be limited to 10% participation in the loan. Exclusively on the basis of that information, Kennedy decided to issue a commitment to participate in the loan. The commitment letter sent to Baker on March 31, 1980 stated that Kennedy was willing to contribute 90% of the funds needed for the $1.25 million loan. Interest on the 25-year loan was set at 13.125%, and the loan was to be secured by a first deed of trust on the building. Kennedy did not inspect the property prior to issuing the commitment. The letter explicitly stated that "[d]isbursement will be made on or before June 1, 1980," and that "express condition[s] precedent to the disbursement of the loan proceeds or any portion thereof" included

(i) *Inspection by Participants.* Representatives of Lead Lender and Partici-

pants shall be permitted to inspect the completed property and this commitment is subject to the inspection and approval by said representatives.

Parker testified that the purpose of the inspection clause was primarily to permit Kennedy to determine whether the building would provide adequate security for the long-term loan.

AMB and Fischer executed and returned the commitment to Parker on April 21, 1980.[1] The sole reservation Fischer and AMB expressed in the accompanying cover letter pertained to the role Mrs. Fischer would play in the transaction, as Fischer did not want his wife's name on the loan.

Baker offered to accompany Parker on an immediate inspection of the premises. The inspection was conducted on May 6 or 8, 1980. Baker and Parker walked through the building together. Construction of the addition was completed sufficiently to permit the lenders to conduct a meaningful inspection. Parker subsequently contacted a general contractor and independent consultant, Wayne Cherrier, who inspected the building in early May, both alone and accompanied by Parker. In a written report, Cherrier gave the building a "poor" rating for a variety of reasons, including the difficulty of converting it for multi-tenant use and his conclusions that it was barely constructed up to code and had been poorly maintained.

As a result of Cherrier's report and Parker's personal inspection, Kennedy decided not to go forward with the loan to Fischer. Parker telephoned Baker on May 12, 1980 to advise him of Kennedy's decision. Parker informed Baker that the decision was based on the fact that the condition of the building was so poor that Kennedy's officers were worried that the State would move out after its current lease expired, compromising the security for the loan.

1. Although the commitment stated that April 11, 1980, was the deadline for timely acceptance, Kennedy apparently waived this condition by accepting checks in the amount of $12,500 representing Fischer's commitment fee. The checks were mailed on or about April 14, 1980. The superior court concluded that the untimely acceptance of the commitment constituted a counter-offer which Kennedy impliedly accepted by dealing extensively with AMB and Fischer after the commitment was executed and returned to Kennedy. This finding is not challenged on appeal.

Fischer and AMB refused to accept Kennedy's withdrawal and did not accept a check for the $12,500 commitment fee which Kennedy had returned to AMB. AMB and Fischer continued to make arrangements to satisfy the conditions set out in the commitment letter. Fischer's attorney wrote to Baker on May 30, 1980, stating that he had gathered the documents necessary to complete the closing and was ready to do so. He admitted at trial, however, that he had been "somewhat stretching the truth" in making such a statement.

The closing never took place and Fischer sought alternative sources of financing. Although he eventually liquidated other holdings to strengthen his financial position, he did not locate another long-term lender. Rather, he continued to pay "prime plus two," or 17½%, the rate of interest on his interim loan.

■ Fischer filed suit for breach of contract alleging that Kennedy had wrongfully failed to honor its loan commitment.[2] The case was tried to the superior court, sitting without a jury. The court found that a contract was formed between AMB and Kennedy, whereby Fischer was to be a third-party beneficiary of a loan to be funded jointly by AMB and Kennedy; that the parties to the transaction contemplated that construction would be complete on or before

June 1, 1980, the final date for closing of the loan, and that the inspection would take place on or about that date; that the inspection occurred substantially before the June 1 deadline; and that Kennedy terminated the commitment solely on the basis of the inspection. The court concluded that Kennedy's withdrawal occurred several weeks before Fischer's duty to perform matured and that the May 12 termination constituted an anticipatory repudiation of the loan commitment. Fischer was awarded damages and attorney's fees. This appeal and cross-appeal followed.

## II.

■ The central issue before us is the propriety of the superior court's construction and application of paragraph 14(i) of the letter of commitment. As the court implicitly concluded, paragraph 14(i) stated a condition precedent to Kennedy's obligation to fund the Fischer loan because it expressly provided that Kennedy's obligation was "subject to" its approval of the building after it conducted an inspection.[3] Since, in general, the non-occurrence of a condition precedent precludes an action by the promisee to enforce the contract, Kennedy's reliance upon 14(i), if justified, would operate as a complete defense to Fischer's suit.[4]

2. Kennedy has never contested Fischer's standing to bring the suit as a third-party creditor-beneficiary of the Kennedy-AMB commitment. It is undisputed that the AMB-Kennedy loan commitment was executed for the benefit of Fischer, the borrower. In entering into the contract, AMB (the promisee) was attempting to satisfy its conditional commitment to arrange the Fischer loan. Therefore, Fischer has standing to sue Kennedy on the contract as an intended creditor-beneficiary. *See White v. Alaska Insurance Guaranty Ass'n*, 592 P.2d 367, 369 (Alaska 1979); *accord, State v. Osborne*, 607 P.2d 369, 371 (Alaska 1980). Fischer does not deny that since his rights are derivative, he is subject to defenses Kennedy could have raised against AMB. *See Osborne*, 607 P.2d at 371; Restatement (Second) of Contracts § 309 comment b (1981).

3. Paragraph 14(i) is set out *supra* at p. 4.

4. *See Rochdale Village v. Public Service Employees Union*, 605 F.2d 1290, 1297 (2d Cir.

1979) ("if [a] contract allows a party to terminate unilaterally, a proper 'repudiation' ends the contract and the parties' . . . obligations; if the contract does not provide a right to terminate unilaterally, repudiation does not terminate the contract, but instead breaches it"); *Watts v. Hogan*, 534 P.2d 741, 743 (Ariz.1975) ("[i]f an agreement is made subject to the consent of an additional party, it must be viewed as conditional and if the consent is not given, the agreement is not binding"); *Sweet v. Stormont Vail Regional Medical Center*, 231 Kan. 604, 647 P.2d 1274, 1280 (1982) (condition precedent is something that the parties agree must happen before a right to enforce a contract accrues); *McCorquodale v. Holiday, Inc.*, 90 Nev. 67, 518 P.2d 1097, 1098 (Nev.1974) (promisor's purpose in attaching a condition precedent to his promise and the legal effect in doing so is to narrow the promisor's obligation so that he will not have to perform if the event fails); *Ross v. Harding*, 64 Wash.2d 231, 391 P.2d 526, 530 (Wash.1964) (conditions prece-

The superior court rejected Kennedy's contention that the repudiation was justified under paragraph 14(i) because it found that the inspection occurred prematurely. The court concluded that the parties had contemplated that the inspection would take place on or about June 1, 1980, rather than in early May, and thus that Kennedy's repudiation occurred before Fischer's performance was actually due. Kennedy challenges this finding of untimeliness, contending that it is completely unsupported by the evidence.

■ The superior court's finding that the inspection was untimely may only be reversed if "clearly erroneous." Although this court will exercise its independent judgment in reviewing a trial court's interpretation of a written contract when such findings are based exclusively upon documentary evidence, *Peterson v. Wirum,* 625 P.2d 866, 871–72 (Alaska 1981); *Pepsi Cola Bottling Co. v. New Hampshire Insurance Co.,* 407 P.2d 1009, 1014 (Alaska 1965); *see also State v. Phillips,* 470 P.2d 266, 268 (Alaska 1970); *Fairbanks Publishing Co. v. Pitka,* 445 P.2d 685, 688 (Alaska 1968), *LeBaron v. Crismon,* 412 P.2d 705, 706 (Ariz. 1966), a "clearly erroneous" standard should be applied where extrinsic testimonial evidence has been presented and relied upon by the trial court in formulating its findings. Alaska R.Civ.P. 52(a);[5] *Osness v. Dimond Estates, Inc.,* 615 P.2d 605, 610 (Alaska 1980); *Penn v. Ivey,* 615 P.2d 1, 3 (Alaska 1980); *Martens v. Metzgar,* 591 P.2d 541, 544 (Alaska 1979). In this case, the trial court heard and relied upon extensive oral testimony in interpreting the inspection clause in the commitment agreement. Thus, application of the clearly erroneous standard is appropriate in reviewing the court's resolution of this contractual dispute.

■ Review of the record persuades us that the superior court erred in concluding that the inspection was untimely. Although paragraph 14(i) did refer to an inspection of the "completed property," there is ample evidence in the record supporting Kennedy's contention that construction of the addition to the Fish and Game building was substantially complete at the time the commitment was executed, and that the parties did not intend that the inspection be delayed until the closing date. Baker, AMB's agent, stated in his April 21, 1980 cover letter to the executed loan commitment that "I would be more than glad to walk through the building with you [Kennedy's agent] at your convenience." Baker met Kennedy's representative at the building on May 6 or 8, 1980 to conduct the "walk through" inspection. He testified that only "minor items" such as concrete stoops and touch-up painting were not complete on that date, and that as they left the site he was under the impression that the 14(i) condition had been satisfied.

Both parties understood that the purpose of the inspection clause was to permit Kennedy to withdraw its commitment if it found that the building would not provide adequate security for the long-term loan. This purpose could not have been served if, as Fischer now contends, the inspection clause was to be construed as constituting a "condition subsequent" to the loan closing.

Fischer cites no evidence in the record which supports the trial court's finding that the parties anticipated that the inspection would take place on or about the closing date. Fischer testified that he had not anticipated that the building would be fully completed on the closing date. This undermines the court's conclusion that the closing, inspection and completion were to occur simultaneously. Fischer testified with

---

dent include facts and events which must exist or occur before there is a breach of contractual duty).

5. Alaska R.Civ.P. 52(a) provides, in relevant part:

In all actions tried upon the facts without a jury ... the court shall find the facts special-

ly and state separately its conclusions of law thereon .... Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

regard to his understanding of paragraph 14(i) that he had gotten the "impression" that Kennedy had already inspected the exterior of the building and that the inspection had been "perfunctory." He had not relied upon statements by Kennedy's agents in reaching this conclusion. Baker, upon whom Fischer purportedly relied in forming this conclusion, testified that he did not remember making such a statement to Fischer. He testified further that he had assumed that the inspection would take place the week of April 17, and that the May 6 or 8 walk-through had satisfied the 14(i) inspection requirement.

Based on the foregoing, we are left "with a definite and firm conviction on the . . . record" that the superior court was mistaken in its finding that the inspection was not to take place until June 1, 1980. *Uchitel Co. v. Telephone Co.,* 646 P.2d 229, 233 n. 8 (Alaska 1982), *quoting Frontier Saloon, Inc. v. Short,* 557 P.2d 779, 781–82 (Alaska 1976) (per curiam); *Headlough v. Headlough,* 639 P.2d 1010, 1012 (Alaska 1982). We hold that Kennedy's reliance upon paragraph 14(i) should not be deemed misplaced because the inspection was "untimely." The inspection which took place accorded fully with the parties' contemplation of the purpose of paragraph 14(i), that is, the articulation of a condition precedent to Kennedy's obligation to disburse funds to Fischer.[6]

## III.

■ We turn now to the question of whether Kennedy acted reasonably in terminating the contract following the 14(i) inspection. Paragraph 14(i) is a classic example of a "satisfaction clause," of a contractual provision making the obligor's duty contingent upon the obligor's satisfaction with the obligee's performance. We have previously upheld such provisions against

allegations that they render illusory the obligor's promise to perform by reading them "to require the exercise of honest judgment and good faith." *Hausam v. Wodrich,* 574 P.2d 805, 809 (Alaska 1978). Thus, we must determine whether Kennedy exercised "honest judgment" and "good faith" in terminating the contract on the basis of its dissatisfaction with the Fish and Game Building.

■ Anticipating that we might reverse its conclusion that the inspection was untimely, the superior court addressed this issue and found, after "full consideration," that Kennedy had acted in good faith in terminating the commitment. The superior court articulated several grounds in support of its decision. First, Kennedy commissioned an independent third party to inspect the premises, and in fact relied upon his recommendation in concluding that the property would not furnish adequate security for a long-term loan. Second, interest rates on long-term loans were declining when it withdrew from the agreement. Third, it acted promptly in inspecting the building and notifying AMB of its decision and the reasons therefor. The court also concurred with the conclusions reached by Wayne Cherrier, Kennedy's consultant, that the building had been "marginally" constructed and poorly maintained, and that it could not be easily converted for multi-tenant use. These factors lend support to the superior court's finding that Kennedy acted honestly and did not invoke 14(i) as a pretext for escaping from a bargain it found unsatisfactory for other reasons. *See* Restatement (Second) of Contracts § 228 comment a (even if only honest dissatisfaction is required, "the dissatisfaction must be with the circumstance and not with the bargain").

---

6. Because we conclude the inspection was timely, we do not address issues relating to the propriety of the superior court's application of the theory of anticipatory repudiation. Specifically, we need not decide whether the court erred in deciding the case on an issue which was neither pled nor litigated; whether the parties' agreement was unilateral or bilateral; whether Kennedy should have permitted Fischer an opportunity to cure the deficiencies; whether Kennedy bore the burden of proving that Fischer would have been ready, willing and able to perform if the breach had not occurred; and whether Kennedy sustained any burden it may have had.

In his cross-appeal, Fischer challenges the superior court's finding that Kennedy acted in good faith. His argument rests primarily upon the contention that the court erred as a matter of law in applying a subjective rather than objective standard of good faith in assessing Kennedy's conduct. The superior court expressly relied upon *Mattei v. Hopper,* 51 Cal.2d 119, 330 P.2d 625 (1958) (en banc), in concluding that a subjective good faith standard should be utilized to evaluate a party's reliance upon a satisfaction clause dependent upon judgment.[7]

The question of whether a court should utilize an objective rather than a subjective standard of good faith in gauging the validity of reliance upon a satisfaction clause dependent upon commercial judgment is one of first impression in this jurisdiction.[8] It is well-established that where the condition requires satisfaction as to commercial value or quality, operative fitness, or mechanical utility, an objective standard is to be used in determining whether the clause has been satisfied. *See Mattei,* 330 P.2d at 626–27 and cases cited therein; *see also Meredith Corp. v. Design & Lithography Center, Inc.,* 101 Idaho 391, 614 P.2d 414, 416 (1980) (satisfaction requirement contained in contract between printing corporation and door manufacturer for printing advertising catalogue sheets was to be determined by an objective standard, since "in most cases involving commercial parties, idiosyncratic preferences are not relevant"). On the other hand, if a judgment dependent upon personal taste or fancy, such as design

---

7. *Mattei* involved an executory contract for the sale of land for a shopping center. The contract provided that the buyer's obligation to consummate the purchase was "[s]ubject to [the procurement] of leases satisfactory to the purchaser." 330 P.2d at 626. The seller-defendant contended that the presence of that clause vitiated the parties' contract by destroying the mutuality of their obligations. The court rejected the argument. In the process of justifying its conclusion that the buyer's obligation was not rendered illusory by this clause, it explained that courts had applied two standards in giving satisfaction clauses effect:

> First, in those contracts where the condition calls for satisfaction as to commercial value or quality, operative fitness, or mechanical utility, dissatisfaction cannot be claimed arbitrarily, unreasonably, or capriciously . . . and the standard of a reasonable person is used in determining whether satisfaction has been received . . . . However, it would seem that the factors involved in determining whether a lease is satisfactory to the lessor are too numerous and varied to permit the application of a reasonable man standard as envisioned by this line of cases. Illustrative of some of the factors which would have to be considered in this case are the duration of the leases, their provisions for renewal options, if any, their covenants and restrictions, the amounts of the rentals, the financial responsibility of the lessees, and the character of the lessees' business.

> This multiplicity of factors which must be considered in evaluating a lease shows that this case more appropriately falls within the second line of authorities dealing with "satisfaction" clauses, being those involving fancy, taste, or judgment. Where the question is

one of judgment, the promisor's determination that he is not satisfied, when made in good faith, has been held to be a defense to an action on the contract. 330 P.2d 626–27 (citations omitted). The California Supreme Court recently reaffirmed its adherence to the *Mattei* rule in *Bleecher v. Conte,* 29 Cal.3d 345, 173 Cal.Rptr. 278, 281 & n. 3, 626 P.2d 1051, 1054 & n. 3 (1981) (en banc); *see also Jacobs v. Freeman,* 104 Cal.App.3d 177, 163 Cal.Rptr. 680, 687 (1980); *Larwin-Southern California, Inc. v. JGB Investment Co.,* 101 Cal.App.3d 626, 162 Cal.Rptr. 52, 58–59 (1979).

8. In *Hausam,* 574 P.2d 805, 809, we cited *Mattei* approvingly in upholding a satisfaction clause involving a purchaser's approval of "books and records" accompanying the sale of a fourplex. However, we did not expressly adopt *Mattei's* holding that a subjective good faith standard should be used in cases where the promisor's satisfaction is dependent upon commercial judgment. *See, e.g.,* Restatement (Second) of Contracts § 228 comment a (1981), which distinguishes between "good faith" required in all such cases, and mere "honesty," necessary where subjective standards are applied. The official commentary accompanying § 228, Satisfaction of the Obligor as a Condition, states that an

> agreement will often use language such as "satisfaction" or "complete satisfaction," without making it clear that the test is merely one of honest satisfaction rather than of reasonable satisfaction. Under any interpretation, the exercise of judgment must be in accordance with the duty of good faith and fair dealing (§ 205), and for this reason, the agreement is not illusory (§ 77).

of a dress or execution of a portrait is involved, a subjective test is appropriate. *See* Restatement (Second) of Contracts § 228 illustration 4 (1981); *Mattei,* 330 P.2d at 627; *Meredith,* 614 P.2d at 416. The difficulty of the case before us lies in the fact that it arises in a commercial context but involves a judgment dependent upon consideration of a multiplicity of factors.

We conclude that the superior court should have applied an objective standard in determining whether the paragraph 14(i) condition was satisfied. Our choice of standard is predicated on the principle that a forfeiture of contractual rights is to be avoided, whenever possible. Therefore, just as "conditions" are construed as covenants, unless the parties have clearly agreed otherwise,[9] so must a preference be given to application of an objective test of reasonable satisfaction whenever practicable and not precluded by the express terms of the parties' agreement.[10]

The conditions which would warrant making an exception to the preference for an objective test are not present here. Paragraph 14(i) simply stated that the agreement was "subject to the approval" of the lenders' representatives; it did not explicitly provide for the application of a subjective test. The subject matter of the satisfaction clause involved a judgment dependent upon commercial rather than aesthetic or artistic standards. It is practica-

ble to apply an objective test in gauging its validity as it cannot reasonably be deemed an "idiosyncratic" decision. *Meredith,* 614 P.2d at 416. Thus, we conclude that the superior court should have applied an "objective" standard in determining whether Kennedy's reliance upon paragraph 14(i) in terminating the agreement was justified.

■ However, the record before us reveals that the superior court's failure to apply the proper standard was harmless error. Kennedy's dissatisfaction with the building was objectively reasonable. Kennedy hired an independent consultant, Wayne Cherrier, to inspect the building on its behalf. Cherrier testified that

> it was a very, very poorly maintained building . . . [which] needed painting inside; all the doors on the inside were marred and . . . they were having problems with . . . the heating system . . . they had tape over most of the air ducts in [some] of the offices . . . . [In the new portion] the quality [of] construction didn't seem to be up to par . . . it was poor to adequate. [The quality of the pre-existing structure was] poor.

In his report to Kennedy, Cherrier stated that

> [t]he existing structure has had little or no maintenance, both to the exterior and the interior of the building. There appears to be very little pride of ownership.

9. *See, e.g., Peterson v. Wirum,* 625 P.2d 866, 873 & n. 14, 874 (Alaska 1981) (condition precedent usually viewed with disfavor; to avoid forfeiture, ambiguous terms are construed as promises rather than conditions).

10. In adopting the preference for an objective test of satisfaction we expressly follow the Restatement (Second) of Contracts § 228 (1981), which provides:

> When it is a condition of an obligor's duty that he be satisfied with respect to the obligee's performance or with respect to something else, and it is practicable to determine whether a reasonable person in the position of the obligor would be satisfied, an interpretation is preferred under which the condition occurs if such a reasonable person in the position of the obligor would be satisfied.

*See Aztec Film Productions v. Prescott Valley, Inc.,* 128 Ariz. 402, 626 P.2d 132, 136 (1981)

(citing with approval Restatement of Contracts § 265 (1932) which indicated preference for adoption of objective test); *Kadner v. Shields,* 20 Cal.App.3d 251, 97 Cal.Rptr. 742, 752 (1971) (where realty purchase and sale contract contained a "satisfaction clause" with regard to purchasers' approval of promissory note, in absence of a specific expression in instrument or clear indication from nature of subject matter, preference of the law is for the less arbitrary standard of reasonable man, not good faith discernment of individual person); *Meredith Corp. v. Design and Lithography Center, Inc.,* 101 Idaho 391, 614 P.2d 414, 417 (1980) (in a contract between commercial parties, the performance bargained for is judged by the utility, fitness or commercial value thereof; contract interpretation which judges satisfaction by reasonable person standard is preferred).

Every part of the building needs some repair or maintenance work. The new addition is not complete as of this writing.

It appears that both structures: existing building and the new addition, were built to meet just the basic code requirements.

I rate the overall project as POOR.

The superior court expressly concluded that the evidence "preponderate[d] in favor of the proposition" that the consultant was a "disinterested, unbiased third party," and that Kennedy relied exclusively upon his report in terminating the commitment.

Fischer offered no independent testimony contradicting this assessment. He relied in part upon statements in the appraisal included in the original loan package to the effect that the building was of "average to good quality." Kennedy presented expert witnesses who testified that the building failed to conform in several respects to the description set out in the appraisal.[11] In rebuttal, Fischer relied solely upon his own testimony. He stated that as a former real estate appraiser, he considered the building to be of

average quality. There's a—it's a little better than some, and not as good as a lot of others.

On the basis of such a record, we are persuaded that the superior court was justified in accepting the conclusion of Kennedy's consultant that the building was "marginal[ly]" constructed and that maintenance was "substandard."

We think it reasonable that Kennedy would be concerned that such a building would not provide adequate security for a long-term loan. The impact of the deficiencies in maintenance and construction was aggravated by the probability that the building was not one which could easily be converted for use by several other tenants. Kennedy was concerned that the deterioration of the building would lead the state to decide not to extend the lease at the expiration of the five-year term. If the building could not be easily converted for multi-tenant use, its cash flow would be seriously compromised, affecting the borrower's ability to make payments on the 25-year loan.

■ In support of its contention that the building would not be easily convertible, Kennedy relied in part upon Cherrier's report which stated that:

The design of this building appears to be for the express purpose of a one time, one agency tenant. In my opinion, no thought was given for a conversion factor, if the present agency moved out. The design is poor.

The superior court expressly found that this conclusion regarding the building's poor conversion factor was well-founded in light of

the small size of the offices ... the length of the hallways ... the small size and location of the restrooms ... the limited number and placement of the entrances ... [and] the cost of relocating the stud sheetrock walls.

Fischer admitted during cross-examination that the building would not be "easily convertible" and attempted to temper the impact of this concession by alleging that "[n]othing is easily convertible." This evidence is insufficient to warrant reversal of the superior court's finding under the clearly erroneous standard.[12]

11. Other than that of Cherrier, Kennedy presented the testimony of a professional appraiser who stated that many of the heat-ventilation systems were plugged up, portions of the ceiling were not taped, some walls and doors were unpainted, and that, in short, the building was not of "average to good quality."

12. Although the superior court determined that the building had a poor conversion factor, it further concluded that Kennedy was "not entitled to rely" on the poor convertibility of the building as a factor permitting it to terminate the agreement on the basis of the 14(i) inspection, because "if Kennedy had done its homework [read the appraisal before issuing the commitment letter], it would have realized that this building was compromised substantially from the standpoint of convertibility to multiple-tenant use."

On appeal, Kennedy persuasively challenges the court's finding that it "waived" its right to rely upon the conversion factor in terminating the agreement and we reverse it accordingly. The appraisal did *not* include a complete set of

In sum, we conclude that Kennedy's concern that the condition of the building was deteriorating and that it would not be readily convertible to multi-tenant use was well-founded. We are persuaded by the uncontradicted testimony of Kennedy's officers that they were justified in concluding that these attributes of the structure rendered it unsuitable as security for a long-term loan. Kennedy exercised its contractual right to terminate the agreement in good faith and in a timely, objectively reasonable fashion. Its duty to fund the loan was discharged accordingly.

The superior court's judgment and award of attorney's fees are therefore REVERSED, and the case is REMANDED for entry of judgment in favor of Kennedy.[13]

plans for the building. Paul Baker, AMB's agent in this transaction, testified that he did not send Kennedy "a formal set of plans," and that those included in the appraisal were marked "preliminary." Baker testified that he would not have relied on the schematic floor plan sketches provided Kennedy, but would have inspected the building personally, as Kennedy did. Second, the appraisal described the property as being easily convertible:

> The building has long central hallways with numerous individual offices which could easily be rented to a number of tenants. The most likely division is for a tenant to rent the building in increments of half of a floor or more, thus, the hallways down each corridor have been included in the net rentable area since the tenant would have exclusive use.

These representations were clearly at odds with the court's own findings and would have misled Kennedy if it had relied upon them. See *supra* p. 183. It is apparent that Kennedy could not reasonably have been expected to have discerned the poor conversion factor from the appraisal. Finally, we note that the court itself expressed frustration with the quality of the diagrams which had been supplied to Kennedy. The court concluded that to make sense of the layout of the building it would have to view the premises personally. The view was conducted subsequently. For these reasons, we conclude that the superior court erred in holding that Kennedy was not entitled to rely upon the building's poor conversion factor in terminating its obligation to fund the loan.

13. Our disposition renders unnecessary consideration of specifications of error pertaining to the court's award of damages, costs and attorney's fees.