**TESORO ALASKA PETROLEUM COMPANY, Petitioner,**

v.

**STATE of Alaska; Commissioner of Natural Resources, State of Alaska; Director of the Division of Lands, State of Alaska; Amerada Hess Corporation; Atlantic Richfield Company; BP Alaska Inc.; BP Alaska Exploration, Inc.; Exxon Corporation; Getty Oil Company; Hunt Industries; Caroline Hunt Trust Estate; Lamar Hunt Trust Estate; N.B. Hunt; the Louisiana Land and Exploration Company; Marathon Oil Company; Mobil Oil Corporation; Sohio Petroleum Company; Chevron U.S.A., Inc.; Placid Oil Company; Phillips Petroleum Company; Partnership Properties Co., a Colorado general partnership; Petro–Lewis Corporation; Union Oil Company of California; Amoco Production Company, Respondents.**

No. S–2400.

Supreme Court of Alaska.

June 24, 1988.

Rehearing Granted in Part and Opinion Amended Aug. 16, 1988.

---

Bruce E. Gagnon and Patrick B. Gilmore, Atkinson, Conway & Gagnon, Anchorage, and J. Paul McGrath, David A. Koenigsberg and Cheryl A. Adams, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for petitioner.

Robert E. Stoller and Wilson L. Condon, Anchorage, for respondent State of Alaska.

William B. Rozell, Faulkner, Banfield, Doogan & Holmes, Juneau, for respondents Atlantic Richfield Co. and ARCO Alaska, Inc.

Carl J.D. Bauman, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for all respondent Companies other than Atlantic Richfield and ARCO Alaska, Inc.

Before RABINOWITZ, BURKE and MOORE, JJ.

## OPINION

MOORE, Justice.

Tesoro Alaska Petroleum Co. contracted with the State to purchase oil which the State received as royalty payments from other lessees of oil rights on Alaska North Slope fields. The price to be paid by Tesoro was tied to the results of *State of Alaska v. Amerada Hess Corporation*, No. 1JU 77–847 Civil, currently pending in superior court, in which the State and a number of oil producers are disputing the proper amount of royalty payments due the State under the State's leases of oil extraction rights to North Slope oil producers. Tesoro moved to intervene in the *Amerada Hess* litigation under Civil Rule 24(a)–(b). The superior court denied Tesoro's motion to intervene. We granted Tesoro's petition for review.

## I.

### A. The *Amerada Hess* Litigation

Between December, 1964, and September, 1969, the State leased oil extraction rights in the Prudhoe Bay and Kuparuk River areas of the North Slope to certain producers of crude oil. Tesoro is not a party to any of those leases. The leases contained provisions for the oil producers to pay royalties to the State. The royalties were to be 12½ percent of the oil produced, payable either in money or in oil.[1] The royalties paid in the form of oil could then be resold by the State.

The *Amerada Hess* litigation concerns only those royalties paid in money. The State brought suit against North Slope oil producers on September 2, 1977, requesting the court to interpret the oil lease contracts to determine the proper method for computing the amount of the royalty payments. This suit is currently pending in superior court.

### B. Tesoro's Leases

Tesoro and the State entered into agreements for the sale and purchase of royalty oil on February 26, 1982 and December 9, 1983. The State had decided on the policy that it should not receive less from the resale of royalty oil than it would have received if it had taken its royalty payment in money. However, since the State and the *Amerada Hess* defendants could not agree on a method for determining the royalty when paid in money, the State could not fix the price to place on the royalty oil it resold. Consequently, the

---

1. The leases provide:

    ROYALTY ON PRODUCTION. Except for oil and gas used on said land for development and production or unavoidably lost, Lessee shall pay Lessor as royalty the following:

    (a) On oil 12½ percent in amount or value of the oil produced and saved and removed or sold from said land ...
    (b) On gas 12½ percent in amount or value of the gas produced and saved and sold or used off said land or used for the extraction of natural gasoline or other products therefrom.

price of the royalty oil in the Tesoro sales and purchase agreement was linked to the results of the *Amerada Hess* litigation.[2] The agreement provided:

2.3 *Price of the Royalty Oil.* The price for the oil tendered under this Agreement shall be equal to the amount that Seller would have received from its Lessees for the Royalty Oil tendered if that royalty had been payable in money (taken in value) rather than taken in kind....

The method, basis and amount of royalty due Seller when it takes its royalty in value from the Leases is presently the subject of litigation in *Amerada Hess*. One of the issues involved is the proper method to be used by the Lessees in calculating the state's royalty when that royalty is payable in money (in value).... Upon resolution of each of the various issues that are or will be involved in *Amerada Hess*, adjustments will be made to previous payments in accordance with each resolution.... Buyer will not voluntarily intervene or otherwise participate in *Amerada Hess* unless Seller expressly consents to that participation in writing. A settlement of *Amerada Hess* will be binding upon Buyer whether or not Buyer agrees with or consents to the terms of that settlement.

Tesoro claims that, at the time Tesoro entered into the sales agreements with the State, the State represented to Tesoro that the State's main position in the *Amerada Hess* litigation was to value the oil acquired by the producers under the formula known as Exhibit B. Accordingly, Tesoro evidently believed that the *Amerada Hess* adjustments would amount to a liability for Tesoro of $0.20 to $0.40 per barrel purchased. However, according to Tesoro, the State's focus in the *Amerada Hess* litigation sub-

sequently shifted to the claim that the oil producers misstated the value of crude oil extracted by them. Tesoro received information indicating that the *Amerada Hess* adjustments could amount to a liability for Tesoro of $1.12 to $2.50 per barrel purchased, in contrast to the much lower range it anticipated when entering into the agreements with the State. This caused Tesoro to become concerned with the price adjustment clause contained in its sales and purchase agreements.

On December 17, 1985 Dennis Juren, President of Tesoro, wrote to Esther Wunnicke, Commissioner of the Department of Natural Resources, expressing his concern with the potential size of the *Amerada Hess* price adjustments and requesting resolution of the matter. Juren acknowledged Tesoro's status as follows:

As you know, Tesoro Alaska is not a party to the *Amerada Hess* litigation. Indeed, the State has contractually prohibited Tesoro Alaska from participating in the case.

Juren met with Commissioner Wunnicke on January 21, 1986 to discuss the *Amerada Hess* price adjustments, but nothing was resolved. In a February 14, 1986 letter to Commissioner Wunnicke, Juren requested the State's consent to Tesoro's intervention in the *Amerada Hess* litigation. Commissioner Wunnicke responded by letter dated March 24, 1986. She agreed to review the case to determine if Tesoro had been misled when it entered into the sales and purchase agreements. She later informed Tesoro that in addressing its intervention request, she would have to consult with the Attorney General, who was responsible for prosecuting *Amerada Hess*.

Along with a letter dated October 1, 1986, Juren submitted numerous papers to

---

**2.** The original pricing term contained in the royalty oil contracts prior to the ones at issue in this case was phrased conceptually and provided for retroactive adjustments to the price depending on the outcome of *Amerada Hess*. An interim pricing mechanism, known as the Exhibit B formula, was included in these earlier sales contracts. The Exhibit B formula reflected the State's best possible outcome in *Amerada Hess*.

The contracts at issue here differed from the contracts originally utilized by the State. A new interim pricing mechanism was implemented in the contracts at issue here. This pricing mechanism was more conservative than the Exhibit B formula, setting the value at the amount which the State would achieve given the worst case result it could get in *Amerada Hess*.

Commissioner Wunnicke documenting Tesoro's theory that the State originally represented the effect of the *Amerada Hess* adjustment clause as limited to the Exhibit B formula.

On November 25, 1986 after reviewing Tesoro's claims, Commissioner Wunnicke issued findings and a decision on the meaning of the *Amerada Hess* price adjustment clause.[3] Commissioner Wunnicke found "that the *Amerada Hess* clause include[d], but [was] not limited to, the 'Exhibit B' issue." Responding to Tesoro's contentions that the State's change in strategy in the *Amerada Hess* litigation resulted in a unilateral change in "the meaning of a term in [their] preexisting contracts" which previously had been clear and precise to all parties, Commissioner Wunnicke found documents "which directly contradict[ed] Tesoro's position." Commissioner Wunnicke made the following findings: During the extensive negotiations prior to entering into the December, 1983 contract, Tesoro's President admitted that his company's exposure "could be [an] enormous amount" as a result of the price adjustment clause. Furthermore, the State's memorandum in support of motion for partial summary judgment in *Amerada Hess*, which became part of the public record in that case as of September, 1980, divided the *Amerada Hess* litigation into two issues, the first of which "would include the validity and accuracy of reported sales prices, costs of tankering, and deductions for other claimed expenses." Finally, the State must not have intended Tesoro's interpretation of the price adjustment clause because that interpretation would cause the State to potentially receive less for the royalty oil ultimately sold to Tesoro than it would have received if it had instead taken its royalty in value.

Not achieving a favorable result from Commissioner Wunnicke, Tesoro filed suit against the State in superior court on December 12, 1986. Tesoro challenged the Commissioner's interpretation of the price adjustment clause and requested the court to declare that the ultimate price adjustment could only be based on the Exhibit B formula and not on other issues raised in *Amerada Hess*. That suit is pending in superior court.

Tesoro then filed its motion to intervene in *Amerada Hess* on June 11, 1987. By letter dated June 22, 1987, the new Commissioner of the State Department of Natural Resources informed Tesoro that the State never consented to Tesoro's intervention.

The superior court denied Tesoro's motion to intervene in *Amerada Hess*, holding that "Tesoro has demonstrated no basis on which this court should deviate from the normal rule of upholding contracts." Judge Carpeneti continued that "[a]ny representations the state might have made at the contract formation stage are not at issue in this proceeding." Alternatively, the court determined Tesoro failed to establish that it had the right to intervene under Civil Rule 24(a) or that the court should exercise its discretion to permit intervention under Civil Rule 24(b).

We granted Tesoro's petition to review the superior court's order.

## II.

It is not necessary to analyze Civil Rule 24 in the context of this case[4] unless we

---

3. These findings were made pursuant to article XXIII, section 23.1 of both contracts entered into by Tesoro.

4. Alaska R.Civ.P. 24 provides:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(b) Permissive Intervention. Upon timely application anyone may be permitted a [sic] intervene in an action when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive

first determine there is some reason for us not to enforce the nonintervention clause contained in the sale and purchase agreements between Tesoro and the State.

Both the February 26, 1982 and December 9, 1983 agreements for the sale and purchase of royalty oil between Tesoro and the State contain nearly identical nonintervention provisions:

> Buyer will not voluntarily intervene or otherwise participate in *Amerada Hess* unless Seller expressly consents to that participation in writing.

We have previously defined waiver as "the intentional relinquishment of a known right." *Milne v. Anderson*, 576 P.2d 109, 112 (Alaska 1978). After reviewing the language of the nonintervention provision and statements made by high officials of Tesoro in two separate letters, we conclude that Tesoro intentionally relinquished its right to intervene in *Amerada Hess*.[5]

Tesoro makes two arguments why the superior court should not have enforced the nonintervention provision contained in the sales and purchase agreements. First, Tesoro argues that the State misrepresented its position in the *Amerada Hess* litigation at the time Tesoro and the State entered into their sales and purchase agreements. Tesoro claims that the State unilaterally changed its position in *Amerada Hess* in a manner that may significantly expand Tesoro's liability, and therefore Tesoro should not be bound to the nonintervention provision. Second, Tesoro argues that the consent provision in the sales and purchase agreements should be governed by an objective standard of good faith. Tesoro claims the State unreasonably withheld its consent to Tesoro's intervention, and therefore the court should not enforce the nonintervention provision.

A. Did the State misrepresent its position to Tesoro?

The nonintervention provision should not be enforced if Tesoro's assent was induced by a material misrepresentation made by the State, upon which Tesoro justifiably relied. *See* Restatement (Second) of Contracts §§ 164, 166 (1981).

Tesoro claims that at the time it entered into the sales and purchase agreements, the State represented to Tesoro that the main issue the State would be pursuing in the *Amerada Hess* litigation was the Exhibit B formula for determining the amount of royalty payments made in money. In December of 1985, Tesoro discovered from a separate agreement for the sale of royalty oil by the State to Petro Star, Inc. and Chevron U.S.A. that the *Amerada Hess* adjustment would probably be between $1.12 and $2.50 per barrel. Tesoro had previously calculated its price adjustments under Exhibit B to be less than $0.50 per barrel. Tesoro discovered that the substantial increase in potential price adjustments was due not only to the Exhibit B price adjustment, but also to the State's allegations in *Amerada Hess* that the defendant oil producers had understated the value of the oil they were taking.

Tesoro claimed that when the main issue in *Amerada Hess* was the Exhibit B formula, "the interests of the producers in defending their position in *Amerada Hess* was similar enough to Tesoro's position under its Agreements," that Tesoro was willing to rely on the outcome of *Amerada Hess* without participating in it. Thus, it agreed to the nonintervention clause. However, in light of the State's new focus in *Amerada Hess*, Tesoro no longer believed that its interests were adequately protected by the oil producer defendants in *Amerada Hess* and felt that it needed to intervene.

The superior court determined that "Tesoro ... demonstrated no basis on which this court should deviate from the normal rule of upholding contracts." We interpret

order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

5. Tesoro makes no argument that such a waiver is invalid or illegal. Thus, we do not address this issue.

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

that statement as a rejection of Tesoro's arguments that the State's purported misrepresentations regarding its position in *Amerada Hess* relieves Tesoro of the necessity to obtain the State's consent to intervene.

We now review that holding,[6] starting with the question of whether the State materially misrepresented its position in *Amerada Hess* to Tesoro. We conclude that Tesoro had notice of the State's claim in *Amerada Hess* that the oil producer defendants had understated the value of the oil they were taking, and therefore there was no material misrepresentation. As originally determined by Commissioner Wunnicke, several documents in the record support this conclusion.

First, in its complaint and first amended complaint in *Amerada Hess*, filed September 2, 1977 and November 1, 1977, the State alleged that the oil producers misstated the value of the oil they were taking, stating:

> That upon plaintiff's information and belief, defendants, and each of them, are improperly determining, allocating, computing, or otherwise accounting for the expenses that may be properly deducted from the value of the oil at the LACT meter into the Trans Alaska Pipeline System.

. . . . .

> Upon information and belief of the State, defendants, and each of them, are improperly determining the value of the royalty oil at the LACT meter.

Thus, before Tesoro agreed to the nonintervention clause, Tesoro had notice through the public documents filed with the court that the State would pursue this theory.

Similar yet more precise allegations were included in the State's second amended complaint in *Amerada Hess*. The State alleged in its second amended complaint:

> That upon plaintiff's information and belief, defendants, and each of them, are improperly determining, allocating, computing, or otherwise accounting for the

expenses that may be properly deducted from the value of the gas at the orifice meter into the Trans Alaska Pipeline System.

. . . . .

> Upon information and belief of the State, defendants, and each of them are improperly determining the value of the royalty oil at the LACT meter and gas at the orifice meter.

. . . . .

> By reason of defendants' improper determination of the values of royalty oil at the LACT meter and gas at the orifice meter, defendants have failed to pay to the State of Alaska the proper amount of oil and gas royalties which are now due and owing and to which the State is entitled by statute and by lease agreement. The total amount of such royalties owed by the defendants is in excess of One Hundred Million Dollars ($100,-000,000.00). The exact amount of royalties owed by each defendant shall be proven at trial.

The State's second amended complaint was filed on June 21, 1983—after Tesoro and the State entered into their first sale and purchase agreement on February 26, 1982, but before they entered into their second agreement on December 9, 1983.

In its reply brief, Tesoro argues that the above-quoted language in the State's complaint is "vague and ambiguous" and "could simply be an alternative challenge to the producers' method for calculating the State's royalty." In its complaint, the State argues that the oil producer defendants "are improperly determining the value of the royalty oil at the LACT meter ..." This allegation does not refer in any way to how the oil producer defendants calculated the royalty payments due the State under the contracts, which is the Exhibit B issue. Instead, this allegation clearly states that the oil producers were reporting the wrong value of the oil at the wellhead.

Further evidence that Tesoro had notice of the State's theories can be found in the

---

**6.** In reviewing the superior court's findings of fact, we apply the "clearly erroneous" standard of review. *See State v. Alex*, 646 P.2d 203, 214 (Alaska 1982).

State's memorandum in support of its motion for partial summary judgment in the *Amerada Hess* litigation, filed on September 19, 1980. In its memorandum, the State described the *Amerada Hess* case as involving two types of issues: (1) those involving facts, and (2) those involving how to calculate the royalty due to the State. The State described the factual issues as including "the validity and accuracy of reported sales prices, costs of tankering and deductions for other claimed expenses." This description encompasses the exact issue which Tesoro claims the State failed to represent as an issue in *Amerada Hess.*

Third, not only was Tesoro placed on notice by the State's complaint and summary judgment memorandum in *Amerada Hess* that the valuation of oil at the wellhead might become a major issue in that case, but also the sales and purchase agreements between the State and Tesoro contemplate price adjustments for all issues—present and future—litigated in *Amerada Hess.* The agreements state:

> Upon resolution of each of the various issues that are or will be involved in *Amerada Hess*, adjustments will be made to previous payments in accordance with each resolution.

This statement indicates that the parties agreed the price of the oil would be adjusted to reflect resolution of all issues in *Amerada Hess*, and not just resolution of the Exhibit B issue as Tesoro claims.

Finally, we agree with Commissioner Wunnicke's finding, prior to Tesoro's motion to intervene, that it would have been illogical and inconsistent for the State to have represented that the price adjustment clause would not be tied to the resolution of all issues in *Amerada Hess.*[7] As the Commissioner found:

> To waive or relinquish any of the factual issues [such as whether the oil producers

were misstating the value of oil extracted by them] ... would mean that should the State prevail on its factual issues in *Amerada Hess*, it would necessarily receive less for its royalty oil through the February 26, 1982 and December 9, 1983 Tesoro contracts than it would have received had it taken its royalty in-value.

This would directly conflict with the State's policy that it should not receive less from the resale of royalty oil than it would have received if it had taken its royalty payment in money.

In sum, the record does not support Tesoro's claim that the State materially misrepresented its position in *Amerada Hess* to Tesoro.[8] Tesoro had notice of the *Amerada Hess* issues that the State is currently advancing; these issues were raised in the complaint, the first amended complaint, the second amended complaint and the supporting memorandum for the State's summary judgment motion. Tesoro took a risk in agreeing to the nonintervention clause. While that agreement may turn out to be more expensive than Tesoro originally anticipated, Tesoro should not be relieved of its promise not to intervene in *Amerada Hess.*

**B. Did the State exercise good faith when it withheld consent to Tesoro's request to intervene?**

Tesoro argues that the State unreasonably withheld its consent to Tesoro's request to intervene in *Amerada Hess* in contravention of the objective standard of good faith which governs all commercial contracts, citing *Kennedy Associates, Inc. v. Fischer*, 667 P.2d 174, 180–82 (Alaska 1983). In this case, it is inappropriate to impose the objective standard of good faith as articulated in *Kennedy Associates.*

*Kennedy Associates* involved the enforcement of a "satisfaction clause," a

---

**7.** The Commissioner found that at least by September 30, 1983, Tesoro officials realized that the price adjustments could be substantial. The Commissioner placed great weight on the handwritten notes of Kay Brown, Director of the Division of Gas and Oil. Apparently, Brown met with Juren on September 30, 1983 and the two discussed, among other things, Tesoro's liability under the price adjustment clause. Brown's notes reflected Juren's concern that

Tesoro's potential liability under the price adjustment clause "could be [an] enormous amount."

**8.** The factual determinations made herein are made for the purpose of this action only and without prejudice to Tesoro's pending administrative appeal, *Tesoro Alaska Petroleum Co. v. State*, No. 3AN–86–15298 Civil.

clause which allowed one party to unilaterally refuse to carry out his or her duty under the contract if not satisfied with the other party's performance. We held that such clauses would be enforced only if a party's dissatisfaction is based on "honest judgment" or "good faith." *Id.* at 180. In making this determination, an objective standard is applied if the contract requires satisfaction as to "commercial value or quality, operative fitness, or mechanical utility," and a subjective standard is applied if the contract requires "a judgment dependent upon personal taste or fancy." *Id.* at 181–82.

The contract clause at issue in this case does not involve a satisfaction clause. The contract simply gives the State the right to keep Tesoro from intervening in *Amerada Hess.* In such cases, we apply a different "good faith" test and limit our review to whether a party that exercised a contractual right did so with an improper motive such as spite, a desire to harm the other party simply for the sake of doing harm, or mere officious intermeddling. *See Alyeska Pipeline Serv. v. Aurora Air Serv.*, 604 P.2d 1090, 1093 (Alaska 1979) (quoting W. Prosser, *The Law of Torts*, § 129, at 943 (4th ed. 1971)). Tesoro makes no allegation that the State acted out of spite or malice. Nor do we find any evidence in the record of such improper motive. Thus, we uphold the State's exercise of its contractual right.

Tesoro has failed to show, nor can we find, any reason why Tesoro should not be bound by its contractual nonintervention clause. Thus, we need not address whether Tesoro satisfied the requirements for intervention as of right under Civil Rule 24(a) or whether the trial court abused its discretion in denying Tesoro's request to intervene under Civil Rule 24(b).

We AFFIRM the order of the superior court denying Tesoro's motion to intervene.

MATTHEWS, C.J., and COMPTON, J., not participating.