[Civ. No. 3789. Fifth Dist. Apr. 2, 1980.]

OLGA JACOBS, as Administratrix, etc., et al.,
Plaintiffs and Appellants, v.
N. W. FREEMAN et al., Defendants and Respondents.

COUNSEL

King, Eyherabide, Anspach, Friedman & Robinson, Stephen Eyherabide and Arthur E. Schwimmer for Plaintiffs and Appellants.

William C. Kuhs for Defendants and Respondents.

OPINION

**FRANSON, Acting P. J.—**

### STATEMENT OF THE CASE

This appeal arises out of an action for specific performance and for damages initiated by appellants, who allege that they entered into contracts with respondent Tenneco West, Inc., for the purchase of two parcels of real property. A complaint sounding in both contract and tort

was filed by appellants Vincent, Eugene, David and Ugo Antongiovanni, individually and doing business as Antongiovanni Brothers, a farming partnership.[1] The complaint alleged four causes of action against the following respondents: Tenneco West, Inc., and individuals N. W. Freeman, Simon Askin, Melvin Jans and Leon McDonough who was dismissed from the action prior to trial. The individual respondents were all employees and/or officers of the respondent Tenneco West, Inc. Howard Marguleas, not named in the original complaint, was served as a Doe defendant.

The following theories of liability were asserted. The first cause of action alleged that appellants contracted in writing to purchase certain real property owned by Tenneco West, Inc. Appellants alleged that the land sale contract consists of certain escrow instructions dated May 16, 1973. These instructions were signed by appellants as "buyer." Melvin Jans and Leon McDonough, senior vice president and assistant secretary respectively of Tenneco West, Inc., signed the instructions for Tenneco as "seller."

Appellants' complaint characterized the escrow instructions as a contract subject to "an implied covenant or alternatively, an implied condition." The instructions contained the following provision:

"IN ADDITION, this escrow is subject to: A. Approval hereof by Seller's Board of Directors."

The crucial allegation to establish breach of contract in appellants' first cause of action is: "Defendants and each of them have also failed to live up to the terms of the contract and are in breach [thereof] inasmuch as the named individual defendants in this action acting for and on behalf of TENNECO WEST, INC., breached the expressed terms of the contract and escrow and further breached the implied term of the contract in escrow to act in good faith and with fairness inasmuch as the individual defendants, acting on behalf of the corporation, did not submit the escrow to that particular entity known as the 'Board of Directors' of the seller, TENNECO WEST, INC. This failure to act and failure to abide by the implied term of the escrow and contract, amounts to a breach of the escrow and contract. . . ." It was further alleged by ap-

---

[1] Vincent Antongiovanni died during the pendency of this action, and it was stipulated by the parties that the administratrix of his estate, Olga Jacobs, would be substituted in place of decedent.

pellants that the defendants, after entering the subject contract, attempted to sell the same property to other parties and that in so doing defendants were guilty of bad faith and malice.

Appellants' first cause of action also alleged that appellants had complied with or had tendered compliance with all conditions required of them under the escrow instructions; that they had paid money outside of escrow to Tenneco, and that Tenneco's deposit of this money in its general account had ratified the contract in question.

The relief sought in the first cause of action included: a decree for specific performance, compensatory damages for lost rents and profits, alternatively damages to compensate for the difference between the contract price and the value of the property as of the date of the breach, and exemplary damages in the amount of $500,000.

The second cause of action sounds in tort. Appellants alleged that Tenneco agents made representations concerning the sale which were known to be false at the time made; that appellants relied on these representations that the subject land would be sold to them on the terms set forth in the escrow instructions, "including the implied obligation to submit said escrow instructions and terms of sale to said Board of Directors." Appellants alleged the false representations were wanton, willful, malicious and amounted to a fraud. They prayed for exemplary damages in the sum of $1 million. Appellants also sought compensatory damages in the sum of $100,000 for the difference between the contract price and the actual value of the property at date of breach.

The allegations of the third and fourth causes of action are basically reiterations of the first and second causes of action.[2]

The matter proceeded to jury trial before Judge Davis. After appellants presented their case in chief, respondents moved for nonsuit pursuant to Code of Civil Procedure section 581c. Respondents argued in essence that the case should not go to the jury because no contract had arisen between the parties due to the lack of board approval of the sale. The trial court granted the motion in favor of all respondents. Judge Davis gave no statement on the record of his reasons for granting

---

[2]The parties have treated this action on appeal as though it involved two causes of action only—one sounding in contract and one sounding in tort. We adopt this characterization in framing the issues in this opinion.

the nonsuit; however, he told the jury when explaining the ruling to them that he "ruled in favor of the defendant on the ground...[he] felt there was no way [they] could render a verdict in favor of the plaintiffs in this case in view of the way the escrow instructions were worded."

Appellants filed a timely notice of appeal.

## THE FACTS

The parties are essentially in agreement as to the facts; they differ mainly on the legal significance of the two sets of escrow instructions dated May 16, 1973. The instructions pertained to two parcels of land, referred to by the parties as the Northeast Quarter and the South Half of section 19, township 30 south, range 27 east, Mount Diablo Base and Meridian (hereinafter the Northeast Quarter and South Half). According to the escrow instructions, the total consideration for the Northeast Quarter was to be $200,460—$3,000 to be paid outside of escrow, $47,115 to be paid through escrow, and the remainder to be evidenced by a promissory note and secured by a deed of trust. The total consideration for the South Half was to be $419,081; $20,000 to be paid outside escrow, $84,771 to be paid through escrow, and the remainder to be evidenced by a promissory note and secured by a deed of trust. Both parcels were subject to agricultural leases. The escrows were scheduled to close after these leases terminated; the escrow on the Northeast Quarter was to terminate in late December 1973, and the escrow on the South Half was to close in late December 1975.

Finally, the escrow instructions provided that the escrow would be subject to certain conditions, including approval by the seller's board of directors. Eugene Antongiovanni testified that he and his brothers were aware of this condition at the time they signed the instructions. Eugene acknowledged that at the time the instructions were signed he had no information leading him to believe that board approval had already been procured. Eugene testified that Mr. Gilbert Castle, who had represented Tenneco in the negotiations with the Antongiovanni brothers for this land sale, had told Vincent Antongiovanni (who died before the action came to trial) that the escrow instructions had to be approved by Tenneco's board of directors.[3] The evidence clearly established that the

---

[3]Eugene had earlier intimated that Castle expressly represented to Vincent Antongiovanni that the escrow instructions *would be submitted*; however, he modified this earlier testimony by stating that to the best of his recollection the exact words were the

board of directors never approved the subject escrow instructions; in fact, neither these instructions nor any information concerning the sale were ever submitted to the board.

At the time relevant to this action, N. W. Freeman, Simon Askin and Howard Marguleas constituted a majority and quorum of the board of directors of Tenneco West, Inc.

Mr. Jans, vice president of Tenneco West, Inc., was in charge of generating the sales of land. He was assisted by Mr. Gilbert Castle who solicited buyers and negotiated sales prices. When a land sale was contemplated, it was Mr. Jans' function to originate form No. 4283 regarding the proposed sale.

On May 17, 1973, the day after the escrow instructions were prepared, Mr. Jans filled out and signed a copy of form 4283 relative to the sale of the subject parcels. This form set forth information regarding the purchase price and terms of the sale to Antongiovanni Brothers and recommended approval of the sale. The form contained a blank space for Howard P. Marguleas' signature; his signature would indicate that he also recommended the sale on the basis that the land was surplus and the negotiated price was favorable. Jans testified that Marguleas' approval on the form was necessary before the matter would reach the board of directors.

Form 4283, as completed by Jans, was sent to Marguleas for his approval. Apparently the sale died at this point. Marguleas' deposition testimony revealed that he had disapproved the sale by not signing the form. Marguleas stated that his understanding of company policy was that if he did not approve a proposed sale, he was not required to take further action regarding the sale.

---

instructions had to be approved by the board of directors. However, Mr. Castle, on direct examination by appellants' counsel, testified that he told Vincent Antongiovanni that the proposed sale would be submitted to the board. On cross-examination he admitted it was difficult to reconstruct a conversation "or even whether it occurred four years ago" and to the best of his recollection it would have been his "practice" only to tell prospective buyers that the sale was subject to board approval. Since we hold that the duty to submit the sale to the board for approval is implied by law in the contracts, the question whether Mr. Castle expressly advised Vincent that the proposal would be submitted to the board is irrelevant to the action for breach of contract. However, as we shall explain, it does become relevant on the cause of action for fraud.

Regarding the possibility that the board would have approved the sale despite Marguleas' recommendation against it, Marguleas stated: "[My disapproval] could well be [the final act, so to speak]. If it was something of great magnitude I might add that I am sure that there are instances that I disapproved which they overruled me, and I can't think of any offhand but [it] wouldn't have been unusual, or I wouldn't have taken offense...." However, there was also evidence suggesting that a majority of the board would not have approved this sale without Marguleas' recommendation. Mr. N. W. Freeman, a member of the board, explained his reliance on Marguleas' opinion: "Marguleas was an experienced agricultural man in all phases of agriculture.... [¶]...I am probably the guy that gave the instruction that no agricultural property was to be acquired or sold without Howard Marguleas' approval because I thought he had more—he was more knowledgeable in what property we should retain and what property we should sell.... [Without Marguleas' approval], I would not as the chief executive officer of Tenneco, I wouldn't have referred it to the Board of Directors of Tenneco, Inc." Mr. Simon Askin, another member of the board, also said that without Marguleas' approval, a transaction would not even be referred to the board.

It is unclear from the evidence exactly when Marguleas decided not to approve the sale of the surplus lands. Marguleas was unable to pinpoint when he decided to disapprove the sale.[4] He testified only that it was "at some point between May 17, 1973 [the date after that shown on the escrow instructions], and September 26, 1973." On the latter date Gilbert Castle sent a letter to appellants informing them that the board of directors of Tenneco, Inc., had not issued approval of the sale. Castle advised that Tenneco would therefore have to withdraw from the transaction. Enclosed with the letter was a check reimbursing appellants for $23,000 paid to Tenneco outside of escrow. Appellants had given Mr. Castle two checks, in the amounts of $20,000 and $3,000 respectively. These checks were dated June 27 and 28, and were paid outside of escrow as provided in the escrow instructions. The checks

---

[4]Marguleas gave the following reasons for his disapproval of the subject sales: "I guess it was a twofold reason: One, that we had sold such an enormous amount of land in the previous 24 months that I felt it was not in the best interest of Tenneco to continue. to sell this land; and...we wanted to become a viable and increasingly important factor in the area of agricultural production and marketing." However, there was evidence that the value of the lands had increased rapidly. There was also evidence that Tenneco had considered other proposals for disposing of the subject lands, before the corporation determined not to sell to appellants.

from appellants were deposited in Tenneco's general account; the funds were retained by Tenneco from late June 1973 until September 26 of that year when Tenneco reimbursed the funds.

Counsel for appellants thereafter sent a letter to Mr. Castle indicating that appellants were ready, willing and able to proceed with the deal. When Tenneco refused to proceed with the transaction, this lawsuit for specific performance and damages was instituted.

### The Contract Action

Although the trial judge did not explain in any detail his reason for granting the nonsuit on either the contract or fraud causes of action, he did state that his ruling was compelled by the wording of the escrow instructions. The judge was apparently convinced by the argument of respondents' counsel that no binding contract arose between the parties because of the express provision that the escrow was subject to approval by the seller's board of directors. ■ As we shall explain, respondents' argument misconceives the law. Upon the signing of the escrow instructions, an executory bilateral contract to sell the land was created obligating the seller to convey the land upon board approval. Furthermore, the seller's agents were required to act in good faith by seeking board approval for the transaction, and the board was required to consider the proposal honestly. Hence, the trial court erred in granting the nonsuit on the ground of the absence of proof of a contract to sell the land.

■ Preliminarily we note the general principles governing a motion for nonsuit: "A nonsuit . . . may be granted 'only when, *disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence,* the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.] Unless it can be said as a matter of law, that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, . . . the trial court is not justified in taking the case from the jury . . . ." (*Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768]; see also 4 Witkin, Cal. Procedure (2d ed. 1971) § 353, pp. 3152-3153.)

■ On appeal from the granting of a nonsuit, the reviewing court should consider only the grounds which were before the trial court. The reason for this rule is that the plaintiff should be given the opportunity to correct the deficiencies in his proof before a nonsuit is granted. As observed by Witkin: "If the court *grants* the motion, the appealing plaintiff should be able to insist that the reviewing court confine its consideration to the grounds specified below notwithstanding the existence of other good grounds; otherwise he is deprived of the opportunity to correct defects." (4 Witkin, Cal. Procedure, *supra*, Trial, § 362, p. 3159.) Thus, in reviewing nonsuits, the appellate courts do not follow the general rule that a judgment should be upheld if it is correct even though the reasons relied upon may be incorrect. (*Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 92-94 [147 P.2d 604].)

Three fundamental interpretive principles compel our conclusion that an executory contract to sell the real property was formed when the parties affixed their signatures to the escrow instructions:[5] ■ First, a contract must receive such an interpretation as will make it lawful, operative, definite, reasonable and capable of being carried into effect, if this can be done without violating the intention of the parties (Civ. Code, § 1643; see also *Rodriguez* v. *Barnett* (1959) 52 Cal.2d 154, 160 [338 P.2d 907]). This rule accords with the primary goal in contract interpretation which is to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful (Civ. Code, § 1636).

■ The second principle is that "[i]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." (*Brown* v. *Superior Court* (1949) 34 Cal.2d 559, 564 [212 P.2d 878], quoted with approval in *Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 940 [132 Cal.Rptr. 424, 553 P.2d 584]; see also *Schoolcraft* v. *Ross* (1978) 81 Cal.App.3d 75, 80 [146 Cal.Rptr. 57]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 576, p. 493; 3 Corbin on Contracts (1960) § 571, p. 349 et seq.; Comment (1975) 22 UCLA L.Rev. 847, 951.) The implied covenant imposes upon the

---

[5]Since there is no conflicting evidence bearing on the proper interpretation of the escrow instructions, this court is required to independently interpret the writings to ascertain their meaning (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Davies Machinery Co.* v. *Pine Mountain Club, Inc.* (1974) 39 Cal.App.3d 18, 23 [113 Cal.Rptr. 784]; see also 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 260, pp. 4250-4251).

parties an obligation to do everything that the contract presupposes they will do to accomplish its purpose.

■ Third, in the case of an uncertainty as to the meaning of a contract, when the uncertainty is not remedied by other rules of interpretation, the language should be construed most strongly against the party who caused the uncertainty to exist. (Civ. Code, § 1654; 3 Corbin on Contracts, *supra*, § 559, p. 262 et seq.; 4 Williston on Contracts (3d ed. 1961) § 621, p. 760 et seq.) Since the seller's agents prepared the escrow instructions, any uncertainty not remedied by other rules of construction must be construed against the seller.

■ Applying these principles, it is clear that the parties who negotiated the sale of the property and signed the escrow instructions intended the contract would be submitted to the seller's board of directors for approval and that the board would consider the proposed sale in good faith. It is also clear that the parties intended the seller's agents would recommend approval of the sale to the board. That this was contemplated by the seller is evidenced by form 4283, prepared and signed by Mr. Jans, which states, "Sale is recommended on the basis that the land is surplus to [company] needs and the negotiated price is most favorable." From the foregoing, we conclude that the condition of board approval of the proposed sale was intended to be a condition precedent to the seller's duty to convey title to the land rather than a condition precedent to the formation of a contract.

Respondents' argument that a contract does not arise when an agreement is executed with the understanding it will not become operative until approved by another person or body, begs the issue. It is only where it can be said that reasonable persons would have understood that the agreement would *not* be effective when originally signed that the rule applies. For example, in *Helperin* v. *Guzzardi* (1951) 108 Cal.App.2d 125 [238 P.2d 141] and *Los Angeles Rams Football Club* v. *Cannon* (S.D.Cal. 1960) 185 F.Supp. 717, the evidence was clear that the parties intended the contract to take effect only when the necessary approval was obtained. The court in *Helperin* stated "...[I]t was understood between Guzzardi and Prindle that the agreement would not constitute a binding contract or be made use of unless and until it was signed by Mrs. Guzzardi" (108 Cal.App.2d at p. 127). In *Los Angeles Rams Football Club* v. *Cannon*, the agreement expressly provided that it "'shall become valid and binding upon each party here-

to only when, as and if it shall be approved by the Commissioner.'" (185 F.Supp. at p. 721.)

Respondents' reliance on cases holding that when one of the parties to an agreement reserves an unqualified right to escape its obligations under the agreement, the promise is illusory and thus cannot constitute a binding contract, is also misplaced. As we have explained, the condition of board approval does not give respondent corporation the absolute right to escape its obligations under the agreement since there is an implied obligation on the part of the seller's officers to carry out the objectives of the contract in good faith by submitting the proposal to the board. Moreover, a part of the implied obligation would be that the board would actually confer and decide whether to approve the proposed sale.[6]

■ Where a contract makes a duty of performance of one of the parties conditional upon his satisfaction, the modern trend is to avoid holding these contracts illusory by implying a requirement that the promisor's determination that he is not satisfied be exercised in good faith. (See, for example, *Rodriguez v. Barnett, supra,* 52 Cal.2d 154, 160-161; *Mattei v. Hopper, supra,* 51 Cal.2d 119, 122-123; *Larwin-Southern California, Inc. v. JGB Investment Co.* (1979) 101 Cal. App.3d 626, 638-640 [162 Cal.Rptr. 52]; see also 1 Corbin on Contracts, § 149, at p. 657.) As Corbin has observed: "It has been thought, also, that promissory words are illusory if they are in form a promise that is conditional on some fact or event that is wholly under the promisor's control and his bringing it about is left wholly to his own will and discretion. This is not true, however, if the words used do not leave an unlimited option to the one using them. It is true only if the words used do not in fact purport to limit future action in any way." (*Ibid.*, fn. omitted.)

Since there was an implied obligation on the seller's part to submit the sale to the board for approval, the seller's promise made through its

---

[6]Whether to approve the sale is clearly a matter of board judgment which only requires an inquiry into the board's good faith in considering the proposal; it would not permit inquiry into the reasonableness of the board's ultimate decision because to do so would conflict with the clear intent of the parties. (See *Mattei v. Hopper* (1958) 51 Cal.2d 119, 123-124 [330 P.2d 625]; cf. *Guntert v. City of Stockton* (1974) 43 Cal. App.3d 203, 209 [117 Cal.Rptr. 601]; *Kadner v. Shields* (1971) 20 Cal.App.3d 251, 258-259 [97 Cal.Rptr. 742].)

executive officers to convey the land once board approval was obtained was not illusory.

■ Having determined that an executory contract to sell land arose by virtue of the escrow instructions and that the implied covenant of good faith and fair dealing required the seller's officers to submit the contract to the board for its approval, it follows that the seller breached its obligation by failing to submit the proposal to the board. Although this does not mean that the seller breached the obligation to convey title to the land, which obligation is dependent upon board approval, it does present an issue of fact as to whether board approval would have been forthcoming if the proposal had been submitted to it.[7] Thus, the trial court erred in granting the nonsuit.

Because we reverse the nonsuit as to the respondent corporate seller on the contract causes of action on the only ground argued and decided below, we do not pass upon other possible grounds for a nonsuit in favor of the corporation. (See 4 Witkin, Cal. Procedure, *supra*, § 362, p. 3159.)

We do, however, affirm the nonsuit on the contract cause of action against the individual respondents. ■ Mr. Jans signed the escrow instructions as agent for a disclosed principal, Tenneco West, Inc. He cannot be held liable on the contract absent a showing that he acted without believing he had the authority to do so. (Rest.2d Agency, § 320; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, § 182, p. 778.) Mr. McDonough was dismissed as a defendant during trial. Since neither Freeman, Askin, nor Marguleas signed the contract, none of them are liable thereon.

### The Fraud Action

■ Appellants contend the seller's agents who negotiated with them concerning the sale of the real property made false representations on which appellants relied to their detriment. Specifically, they assert

---

[7]As we have noted, under the present record a jury question arises as to whether the board would have approved the sale if the proposal had been presented to the board. The credibility of the respondents' witnesses on this point was for the jury (Evid. Code, § 312, subd. (b)). Furthermore, a jury question may arise as to whether the seller's agents acted in bad faith in not presenting the contract to the board, thereby excusing performance of the condition, as provided in the Restatement of Contracts, section 295. (See 3A Corbin on Contracts, § 769, p. 554.)

that respondents represented they would submit the sale to the board for its approval; that respondents knew the representation to be false in that they did not intend to submit the sale to the board without Marguleas' prior approval; that the representation was willful and malicious and that appellants relied on it by entering into the escrow agreement and complying with its terms including the payment of monies to the seller.

 Actionable fraud requires a negligent or intentional misrepresentation of a material fact. A promise material to the contract which is made without any intent of performing it is deemed a misrepresentation of fact (Civ. Code, §§ 1572, subd. (4), 1710, subd. (4)). In the present case, as explained in footnote 3, *ante*, there is substantial evidence, albeit questionable, that Mr. Castle expressly represented to Vincent Antongiovanni that the contract would be submitted to the board. Since the credibility of witnesses is for the jury (Evid. Code, § 312, subd. (b)), this evidence raises an issue of fact as to whether respondents expressly misrepresented a material fact to appellants.

 In the final analysis, what respondents were guilty of was a failure to disclose to appellants that the contract had to be approved by Mr. Marguleas before it was submitted to the board. This fact was concealed by the seller's executive officers when they signed the contract. Although a duty to disclose a material fact normally arises only where there exists a confidential relation between the parties or other special circumstances require a disclosure, where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated. (Rest.2d Torts, § 529; 4 Witkin, Summary of Cal. Law, *supra*, Torts, § 464, pp. 2727-2728; 34 Cal.Jur.3d, Fraud and Deceit, § 24, pp. 592-594.) When the seller's agents represented that the proposed sale would be submitted to the board for approval, they should have disclosed that such submission was subject to prior approval by Marguleas. The failure to disclose this qualifying fact constitutes sufficient evidence of actionable misrepresentation to go to the jury.

Again, because the trial court's only articulated basis for granting the nonsuit on the fraud cause of action was that it felt there was no way that the jury could render a verdict for the plaintiff under the terms of the escrow instructions, we do not pass upon other possible grounds for the nonsuit. (See 4 Witkin, Cal. Procedure, *supra*, § 362, p. 3159.)

Since an agent who knowingly participates in a fraudulent transaction is equally responsible with his principal (3 Cal.Jur.3d, Agency, § 119, pp. 166-167), a factual question is presented as to whether respondent Jans participated in the misrepresentation by reason of his signing the escrow instructions. However, as to respondents Freeman, Askin, and Marguleas, the record is devoid of any evidence that they made any express or implied representations of fact to appellants. Accordingly, the judgment of nonsuit should be affirmed on the fraud cause of action as to respondents Freeman, Askin, and Marguleas.

The judgment of nonsuit on the contract causes of action is reversed as to respondent Tenneco West, Inc., a corporation. The judgment of nonsuit on the fraud causes of action is reversed as to respondent Tenneco West, Inc., a corporation, and as to respondent Jans, an individual. The judgment is affirmed on all causes of action as to the other individual respondents.

Hopper, J., and Fretz, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.