[No. A055031. First Dist., Div. Five. Sept. 16, 1992.]

SAN FRANCISCO INTERNATIONAL YACHTING CENTER
DEVELOPMENT GROUP et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent.

## COUNSEL

Bostwick & Tehin, Nikolai Tehin and Mary C. Anderson, for Plaintiffs and Appellants.

Louise H. Renne, City Attorney, Kimberley Reiley Clement, Chief Deputy City Attorney, and Geoffrey Spellberg, Deputy City Attorney, for Defendant and Respondent.

## OPINION

**HANING, Acting P. J.**—Appellants San Francisco International Yachting Center Development Group et al. appeal a judgment dismissing their action for breach of contract and misrepresentation against respondent City and County of San Francisco (the City).[1] The principal issue is whether certain leases granted by the San Francisco Port Commission require approval by the San Francisco Board of Supervisors.

### PROCEDURAL HISTORY AND FACTS

Appellants sought to develop a maritime, yachting, retail and exhibition center at Piers 24, 24 Annex and 26 in San Francisco (the Property). After extensive discussions, the port commission agreed to lease the Property to appellants for two years with an option to renew for fifty years. The draft agreements expressly stated that their terms would commence "on the effective date of the ordinance of the San Francisco Board of Supervisors approving the [leases and/or option]." The port commission approved the proposal by resolution, expressly subject to approval by the board of supervisors. The board of supervisors did not give its approval, and the port commission later voted to accept the development proposal of another developer.

Appellants' first amended complaint alleges breach of contract and negligent and intentional misrepresentation. The City demurred to the breach of contract causes of action on the ground that no valid contract existed because the lease and option agreements had not been approved by the board of supervisors, as required by section 7.402-1 of the San Francisco Charter (Charter). (See *Williams Bros. & Haas* v. *City & Co., S.F.* (1942) 53 Cal.App.2d 415, 417 [128 P.2d 56] [contract entered into by public entity invalid if not executed in conformance with the city charter.]) The City also

---

[1]Also appealing are Robert D. Scott, Thomas F. Eden, and Theodore A. Eden.

moved for judgment on the pleadings on the misrepresentation causes of action on the ground of governmental immunity. (Gov. Code, § 818.8.)[2]

Appellants opposed the demurrer on the ground that the Burton Act (the Act) (Stats. 1968, ch. 1333, p. 2544) gave the port commission exclusive authority to enter into leases of port property without the approval of the board of supervisors. They also contended that judgment on the pleadings was unavailable because Government Code section 818.8 immunity does not apply where misrepresentation arises out of a breach of contract.

The trial court sustained the demurrer with leave to amend and granted judgment on the pleadings on the ground that the "[l]ease in question is subject to [Charter] section 7.402.1 requirement." Appellants failed to file a second amended complaint, and judgment of dismissal was entered against them, from which this appeal ensued.

DISCUSSION

I

When reviewing a complaint that has been dismissed by general demurrer, we assume the truth of all material factual allegations, and consider judicially noticeable facts. (See *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) A motion for judgment on the pleadings is confined to the face of the pleadings under attack and is subject to the same standard of appellate review. (6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 263, pp. 564-565.)

Appellants contend the lease and option contracts were valid because the Act conferred exclusive authority on the port commission to enter into such agreements without requiring the approval of the board of supervisors. They also argue that Charter section 7.402-1 is invalid as applied to port commission leases because it conflicts with the Act and Charter section 3.581.

The uncodified Act authorized the transfer of the state's interest in the San Francisco port in trust to the City "for purposes of commerce, navigation, and fisheries and subject to the terms and conditions specified in this act. . . ." (The Act, § 2.) The transfer became effective following San

---

[2]Government Code section 818.8, states: "A public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional."

Francisco voters' approval of the Act in the November 1968 General Election. Its relevant sections are as follows:

Section 3 of the Act states that "[the City], through a Harbor Commission of the [City], shall have complete authority, except as otherwise agreed to as a condition of the transfer and as provided in this act, to use, conduct, operate, maintain, manage, regulate, improve and control the harbor of San Francisco and to do all things it deems necessary in connection with the use, conduct, operation, management, maintenance, regulation, improvement and control of said harbor which are not prohibited by the laws of the State of California or the [Charter] and which are in conformance with the terms of this act, including, without limiting the generality of the foregoing, the following: [¶] . . . [¶] (6) The grant of franchises thereof for limited periods not exceeding 66 years . . . and the lease of said lands [and] facilities . . . and the collection and retention of rents and other revenues from such leases . . . ."

Section 5 vests the City with authority to use revenues accruing from or out of the use of the harbor for specified purposes provided they comply with the terms of the trust "which are matters of statewide as distinguished from local or purely private interest and benefit[.]"

Section 9 requires that as express conditions to the transfer, the City: (1) Indemnify and hold harmless the state regarding all outstanding bond indebtedness incurred for harbor improvements; (2) transfer to the state the funds necessary to pay the amounts due on such bond indebtedness; and (3) assume port authority obligations under all other outstanding contracts, leases, franchises or agreements.

Section 11 provides that following transfer of the harbor and facilities to the City, the City "shall thereupon assume control and jurisdiction over the San Francisco Harbor and facilities and shall have complete authority to use, operate, maintain, manage, regulate, improve and control the harbor . . . ."

Section 12 states: "San Francisco Harbor and facilities shall be under the administration and control of the Harbor Commission of the [City] which shall be established in accordance with the provisions of the [Charter]."

Section VII of the transfer agreement between the state and the City is entitled "AUTONOMOUS OPERATION" and provides, in relevant part: "Section 12 of the Act provides that the transferred property shall be under the administration and control of the Harbor Commission of the [City]. Section 4 of the Act provides for the establishment of a separate Harbor Trust Fund

or Funds upon the transfer. Section 2 of the Act provides that the property transferred be held in trust for specified purposes and subject to the terms and conditions of the Act. In order to insure that these provisions be complied with it is advisable that the transferred property be administered independently from other [City] property. Certain charter amendments are before the voters designed to insure this autonomous operation and such amendments will be approved by the voters prior to the transfer. . . . [¶] The Port Commission provided for by the Act shall have all the powers and duties given to boards and commissions by section 19 of the charter and shall have the power to establish such departments and bureaus as may be necessary or convenient for the conduct of its affairs. Subject to the terms and conditions of the transfer and this agreement, the Port Commission shall have the control and management of all real and personal property transferred under the Act, or otherwise acquired or purchased with funds under its control or acquired or purchased by it within the scope of its authority, or otherwise placed under its management, supervision and control. The property under the control and management of the commission shall be known as the Port Area. The Port Commission shall have the power and duty to use, conduct, operate, maintain, manage, regulate, and control the Port Area of San Francisco and to do all things it deems necessary in connection with the use, conduct, operation, management, maintenance, regulation, improvement and control of said Port Area, or which may further the interests of the Port in world trade, including, without limiting the generality of the foregoing, the exclusive power to perform or accomplish the following in the Port Area: [¶] . . . [¶] 6. The grant of franchises thereof for limited periods not exceeding 66 years for wharves and other public uses and purposes and the lease of said lands, facilities, or any part thereof for limited periods not exceeding 66 years, and the collection and retention of rents and other revenues from such leases, franchises . . . . Such lease or leases, franchises . . . shall be for purposes consistent with the trusts upon which the lands are held by the State and with the requirements of commerce and navigation, or if the Port Commission of the [City] determines that any portion of the transferred lands is not required for the foregoing uses described in this section, such lease or leases, franchises . . . may be for the purposes of such development and use as the commission finds will yield maximum profits to be used by the commission in the furtherance of commerce and navigation; [¶] 7. Leases and franchises granted or made by the Port Commission shall be administered exclusively by the operating forces of the Port Commission; [¶] . . . [¶] 20. This section does hereby vest in the Port Commission all of the powers set forth in Section 3 and Section 5 of the Act."

The transfer agreement was conditioned upon San Francisco voters' approval of a series of Charter amendments creating a port commission. (See

Charter §§ 3.580-3.585.) These Charter amendments were approved in the 1968 General Election. Charter section 3.581 provides, in relevant part: ". . . Subject to the terms and conditions of the transfer and any supplemental agreements relating thereto, the port commission shall have the control and management of all real and personal property transferred under [the Act], or otherwise acquired or purchased with funds under its control or acquired or purchased by it within the scope of its authority, or otherwise placed under its management, supervision and control. The property under the control and management of the commission shall be known as the port area. The port commission shall have the power and duty to use, conduct, operate, maintain, manage, regulate, and control the port area . . . and to do all things it deems necessary in connection with the use, conduct, operation, management, maintenance, regulation, improvement and control of said port area, . . . including, without limiting the generality of the foregoing, the exclusive power to perform or accomplish the following: [¶] . . . [¶] (f) The grant of franchises thereof for limited periods not exceeding 66 years for wharves and other public uses and purposes and the lease of said lands, facilities, or any part thereof for limited periods not exceeding 66 years. . . . [¶] (g) Leases and franchises granted or made by the port commission shall be administered exclusively by the operating forces of the port commission; [¶] . . . [¶] (t) This section does hereby vest in the port commission all of the powers set forth in Section 3 and Section 5 of [the Act], which provisions are hereby incorporated in the charter by this reference."

Charter section 3.584 provides that in matters of control and operation of the harbor and its facilities and equipment, the port commission shall be subject to the budgetary and fiscal procedure provided elsewhere in the Charter.

Charter section 7.402-1 was enacted in November 1978 and provides: "Notwithstanding any other provision of this charter, the lease of real property by any department, board or commission for a period of time in excess of 10 years, or having anticipated revenue to the city and county of $1,000,000 or more, or the modification, amendment or termination of any lease, which when entered into was for a period of time in excess of 10 years, or had an anticipated revenue to the [City] of $1,000,000 or more, shall be subject to approval of the board of supervisors by ordinance." It is undisputed that the subject agreements involve a term in excess of 10 years and revenue of more than $1 million.

By their plain language sections 3, 11, and 12 of the Act create the port commission as a subordinate agency of the City to carry out the management

and operation of the harbor and its facilities and equipment. Sections 5 and 9 of the Act vest the City with responsibility for revenue control and the state's bonded indebtedness. However, ambiguity exists as to whether the City or the port commission has final leasemaking authority. Because sections 3 and 12 of the Act both provide for control of the harbor in accordance with provisions of the Charter, we must consider whether the later-enacted Charter section 7.402-1 may be harmonized with the Act.

■ Our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, we first look to the words of the statute themselves, giving the language its usual, ordinary import. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. Where uncertainty exists, consideration should be given to the consequences that will flow from a particular interpretation. Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. (*Walnut Creek Manor* v. *Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 268 [284 Cal.Rptr. 718, 814 P.2d 704].)

■ A 1980 opinion by the San Francisco City Attorney addressed the question of whether Charter section 7.402-1 requires approval by the board of supervisors of leases entered into by the port commission which have a term in excess of 10 years or involve revenues of at least $1 million, and concluded that it did. (S.F. City Atty., Opn. No. 80-18, p. 1.) The opinion first noted that Charter section 7.402-1 was added as a result of the passage of Proposition I in the November 1968 General Election. The ballot pamphlet argument in support of Proposition I stated that the Charter contained no provision giving the board of supervisors power to review long-term or high revenue real property leases. (S.F. City Atty., Opn. No. 80-18, p. 2.) The ballot pamphlet stated: " 'For example, as the Charter presently is written, the board of supervisors has no authority over the important, sometimes controversial, long-term leases at . . . Fisherman's Wharf . . . .' " (*Ibid.*, italics omitted.) The opinion concluded that on its face, Charter section 7.402-1 clearly applies to all real property leases coming within its terms, regardless of source and "notwithstanding any other provision" of the Charter, since the port commission is a City commission granted the powers and duties of a commission in Charter sections 3.581 and 3.500. (*Id.*, at p. 3.)

The city attorney's opinion next analyzed Charter section 7.402-1 in light of the Act and those Charter sections specifically regarding the port commission (Charter §§ 3.580-3.585), and concluded they could be harmoniously reconciled. The opinion noted that the Legislature's major concern in

transferring the port to the City was the state's outstanding bond indebtedness for San Francisco port improvements. To safeguard payment of the outstanding bonds, the Legislature provided that the port lands be held in trust for specific purposes (the Act, §§ 2, 3, 5), and the transfer to the City was conditioned on the City's assumption of all the outstanding bonded indebtedness for harbor improvements and payment of such amounts to the state (the Act, § 9). (S.F. City Atty., Opn. No. 80-18, pp. 3-4.) The opinion suggests that Charter section 3.584 reflects the state's recognition that the City should have some measure of financial control over the port commission in light of the large financial obligation the City was assuming in the transfer. It then concluded that Charter section 7.402-1 is one of the "fiscal procedures" of the Charter and therefore, by virtue of Charter section 3.584, applies to the real property leases entered into by the port commission specified in Charter section 7.402-1. (S.F. City Atty, Opn. No. 80-18, at pp. 5-6.)

The city attorney's opinion concluded that the board of supervisors' review and approval of the subject port leases would enhance the prospects of increasing port revenues, thereby supporting the Legislature's concerns regarding the outstanding bonded indebtedness. It also concluded that Charter section 7.402-1 does not conflict with the Act, the transfer agreement or any other Charter sections. ". . . The Port Commission retains under Charter section 3.581(6) the 'exclusive power' to grant franchises or leases. The Port Commission alone can decide whether to lease, to whom a lease should be granted, the property to be leased and to what purposes lease revenues should be committed. Only if the Board of Supervisors disapproves the lease need the Port Commission consider changing its terms in response to the Board's action. [¶] This limited compromise of authority is also consistent with the City's obligation to indemnify the state and provide funds if necessary from the general treasury to retire the outstanding port bonds, as expressed in Section 9 of the [Act] and Section IV of the Transfer Agreement . . . . [T]he Board of Supervisors for all intents and purposes is ultimately responsible under the [Charter] for the City's continued financial health, in partnership with the Mayor. In such circumstances, it is certainly appropriate to interpret Charter Section 3.584 and the [Act] as authorizing the limited review authority provided for in Section 7.402-1. Leases of the type covered by Section 7.402-1 invariably deal with significant public assets. The state as well as the citizens of the [City] have declared that in such circumstances, the City's elected representatives should play a limited role in the decision-making process." (S.F. City Atty., Opn. No. 80-18, pp. 7-8, fn. omitted.)

The city attorney's opinion is persuasive. State statutes should be construed, if possible, to avoid conflict with city charters. (*Building Material &*

*Construction Teamsters' Union* v. *Farrell* (1986) 41 Cal.3d 651, 665 [224 Cal.Rptr. 688, 715 P.2d 648]; *Evans* v. *San Francisco Unified School Dist.* (1989) 209 Cal.App.3d 1478, 1483 [258 Cal.Rptr. 15].) ■ The fundamental rules of statutory construction apply equally to the interpretation of city charter provisions. (*De Young* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 17 [194 Cal.Rptr. 722].) It is assumed that a city has existing laws and charter provisions in mind when it enacts or amends a charter. (See *Estate of McDill* (1975) 14 Cal.3d 831, 837 [122 Cal.Rptr. 754, 537 P.2d 874].) Consequently, we may presume that when Charter section 7.402-1 was enacted in 1978, the City was mindful of the Act and Charter section 3.581.

■ Section 3 of the Act provides that the City, through the harbor (port) commission, shall have complete authority over the harbor and may undertake such action not prohibited by state law or the *Charter*. Section 12 of the Act provides for the establishment of a harbor commission in accordance with the *Charter*. Neither of these sections is expressly limited to those Charter sections dealing only with the port commission. Consequently, Charter section 7.402-1 and the Act may be harmonized as can Charter sections 7.402-1 and 3.581, as requiring approval by the board of supervisors for the proposed lease at issue herein.

## II

■ Appellants next contend that the state's interests, reflected in section 5 of the Act, conflict with and therefore preempt Charter section 7.402-1. We disagree. ■ "Chartered cities have full power to legislate on *municipal affairs* unless: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.' " (*Tri County Apartment Assn.* v. *City of Mountain View* (1987) 196 Cal.App.3d 1283, 1295 [242 Cal.Rptr. 438], quoting *In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809].)

■ Section 5 of the Act requires the City to use revenues derived from the harbor for purposes that comply with the terms of the trust, "which are matters of statewide as distinguished from local or purely private interest

and benefit." (The Act, § 5.) The issue of revenue use is unrelated to the requirement of approval by the board of supervisors of port leases specified in Charter section 7.420-1. Consequently, there is no conflict and no preemption.

### III

In reliance on *Smith* v. *Mt. Diablo Unified Sch. Dist.* (1976) 56 Cal.App.3d 412, 416-417 [128 Cal.Rptr. 572], appellants next contend that the port commission's approval of Resolution 87-142 created a valid, enforceable contract. However, *Smith* is distinguishable in that it dealt with a board of education that possessed the final authority to contract for equipment as opposed to the port commission's resolution that required board of supervisors' approval.

### IV

Finally, appellants contend that even if approval by the board of supervisors was required by Charter section 7.402-1, the City cannot claim a valid contract did not exist because the port commission failed to act in good faith in seeking the board of supervisors' approval. They rely on *Jacobs* v. *Freeman* (1980) 104 Cal.App.3d 177, 189 [163 Cal.Rptr. 680], for the proposition that the board's approval was not a condition precedent to the formation of an enforceable contract, but was merely a reference to the date on which the lease and option agreements would begin to run, and a "rubber-stamp" of the port commission's decision. *Jacobs* is distinguishable.

*Jacobs* involved written escrow instructions executed by private parties regarding the sale of real property. The instructions provided for approval by the seller's board of directors. The Court of Appeal held that the escrow instructions signed by the parties constituted an executory bilateral contract obligating the seller to convey the property upon the board of supervisors' approval, and such approval was not a condition precedent to formation of the contract, but instead was a condition precedent to the seller's duty to convey the property.

In contrast to *Jacobs*, the draft lease and option agreements at issue herein were never executed by the parties. In addition, the provision for approval by the board of supervisors is a requirement of the Charter which the parties could not waive. ■ When a municipal charter contains an express limitation on the manner in which a city may contract, the city is bound only by contracts executed in accord with the charter provision. When there has been no compliance with the relevant charter provision, the city may not be liable in quasi-contract and will not be estopped to deny the validity of the

contract. (*Dynamic Ind. Co.* v. *City of Long Beach* (1958) 159 Cal.App.2d 294, 299 [323 P.2d 768].)

Because the draft lease and option agreements were not approved by the board of supervisors, no valid contract was formed. Consequently respondents' demurrer was properly sustained and their motion for judgment on the pleadings was properly granted.

The judgment is affirmed.

King, J., and Hanlon, J.,* concurred.

Appellants' petition for review by the Supreme Court was denied December 17, 1992.

*Judge of the San Francisco Superior Court sitting under assignment by the Chairperson of the Judicial Council.