Filed 11/13/13  Assn. for LA Deputy Sheriffs v. Baca CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ASSOCIATION FOR LOS ANGELES DEPUTY SHERIFFS,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>LEROY D. BACA et al.,<br><br>Defendants and Respondents. | B238141<br><br>(Los Angeles County<br>Super. Ct. No. BC425165) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert Hess, Judge.  Reversed and remanded.

Green & Shinee, Richard A. Shinee and Elizabeth J. Gibbons; Benedon & Serlin, Gerald M. Serlin & Wendy S. Albers for Plaintiff and Appellant.

Liebert Cassidy Whitmore, Steven M. Berliner and Alex Y. Wong for Defendants and Respondents.

_____

The Association for Los Angeles Deputy Sheriffs (ALADS), the employee organization for Los Angeles County deputy sheriffs, and the Los Angeles County Sheriff's Department (Department) entered into a settlement agreement in 1991 to resolve a civil action and unfair labor practice proceeding challenging the Department's adoption of new procedures for conducting administrative investigations of deputies concurrently the subject of a criminal investigation arising from the same incident. In October 2009, after failing to obtain ALADS's agreement to modify the procedures set forth in the 1991 settlement agreement and permit earlier administrative interrogation of deputies suspected of criminal misconduct, the Department unilaterally implemented its proposal. ALADS sued the Department, Los Angeles County and Sheriff Leroy D. Baca for breach of contract. Following a bench trial the court ruled in favor of the defendants, concluding the 1991 settlement agreement, which had no express provision defining its duration, had terminated after a reasonable time. We reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *Events Leading to the Settlement Agreement; the Settlement Agreement*

The Department has separate units that review allegations of misconduct, including domestic violence and assault and battery, against its deputies. The Internal Criminal Investigations Bureau conducts criminal investigations that may lead to referral of the matter to the district attorney's office for filing criminal charges. The Internal Affairs Bureau (IAB) reviews misconduct allegations administratively, which may result in disciplinary action. The Department's homicide bureau investigates officer-involved shootings in which a person has been wounded, known as "hit shootings," whether or not a death is involved. The bureau's report, a "shoot book," is given to the district attorney's office to determine whether criminal charges should be filed. The IAB also reviews officer-involved shootings to determine whether the incident complied with Department policy, but does not question the deputies directly involved in the shooting.

Until 1987 it was the Department's practice to postpone administrative investigation of potential criminal misconduct involving sworn deputies until the criminal investigation and, if charges were filed, the trial and any appeals were completed. In

September 1987, however, the Department ordered Deputies James Gates and Donnie Johnson, who had been accused of using excessive force against a suspect in their custody, to participate in an administrative investigation of the incident while the criminal investigation was pending. In response Gates, Johnson and ALADS filed an unfair labor practice charge against the Department, alleging it had unilaterally changed, without notice or opportunity to meet and confer, its long-standing practice of postponing administrative investigations. ALADS also filed a superior court action for injunctive and declaratory relief and for violation of Deputies Gates's and Johnson's civil rights.

In October 1987 the court issued a preliminary injunction, which it modified in October 1988. In November 1989 the parties stipulated to entry of a permanent injunction. In April 1990 a judgment for permanent injunction was entered prohibiting the Department from requiring Gates, Johnson and three additional named deputies under criminal investigation to participate in an administrative interrogation until the criminal cases against them had been resolved. More broadly, the injunction further prohibited the Department from "[r]equiring any other deputy sheriff similarly situated . . . from participating in an administrative interrogation during the pendency of a criminal proceeding or during the pendency of a criminal investigation until such time as [the unfair labor practice charge] has been fully adjudicated before the Los Angeles County Employee Relations Commission."

The hearing on the unfair labor practice charge, initially scheduled for October 1990, was continued until February 1991. In January 1991 the matter was taken off calendar at the request of the parties. In May 1991 the Department and ALADS entered into a settlement agreement stating, "Both parties desire to avoid the uncertainties of litigation of the issues involved in this matter, and agree the matter is completely settled upon the following terms[.]" The settlement agreement, a compromise between the parties, provided the Department would not require a deputy subject to concurrent criminal and administrative investigations arising out of the same incident to submit to an administrative interrogation until it was determined criminal charges would not be filed, consistent with the Department's earlier practice, or the deputy was arraigned on the

3

criminal charge or the deputy requested a continuance on the criminal charge, points significantly earlier in the criminal process than the Department's prior practice of waiting until criminal charges had been completely resolved. (The Department was not precluded from initiating an administrative investigation; the settlement agreement only addressed when the deputy could be interrogated in the administrative proceeding and ensured a deputy's compelled statement would not be made available to the district attorney's office for use in determining whether charges would be filed.)[1] The 1991 settlement agreement did not specify its duration or set a date or provide a method for termination. As part of the settlement, ALADS withdrew the pending unfair labor practice charge and dismissed the superior court action.

2. *The Department's Dissatisfaction with the Settlement Agreement; the Instant Action; Denial of the Department's Motion for Summary Judgment*

In two high profile officer-involved shooting cases in 2005 and 2006, the Department obtained waivers from ALADS to administratively interrogate deputies

---

[1]      The Fifth Amendment protection against compelled self-incrimination does not prevent a public employer from disciplining an employee who refuses to answer official job-related questions when there is no requirement the employee agree the answers may be used in a criminal prosecution against the employee. "Given the paramount duty of public employees to their employers, and the importance of ensuring the proper performance of public duties, the decisions consistently indicate that a public employee may be compelled, upon threat of job discipline to answer questions about his or her job performance, so long as the employee is not also required to *surrender* the constitutional privilege against criminal use of any statements thereby obtained." (*Spielbauer v. County of Santa Clara* (2009) 45 Cal.4th 704, 718; see *Lefkowitz v. Turley* (1973) 414 U.S. 70, 77-79 [94 S.Ct. 316, 38 L.Ed.2d 274]; *Garrity v. New Jersey* (1967) 385 U.S. 493, 500 [87 S.Ct. 616, 17 L.Ed.2d 562]; see also *Lybarger v. City of Los Angeles* (1985) 40 Cal.3d 822, 827 ["[A] public employee has no absolute right to refuse to answer potentially incriminating questions posed by his employer. Instead, his self-incrimination rights are deemed adequately protected by precluding any use of his statements at a subsequent criminal proceeding."].) Pursuant to Government Code section 3303, subdivision (h), before being required to answer an employer's investigatory questions, a peace officer must be informed of his or her constitutional rights if there appears a possibility the officer will be charged with a criminal offense. (*Lybarger*, at pp. 828-829; *Williams v. City of Los Angeles* (1988) 47 Cal.3d 195, 200-201; see *Spielbauer*, at pp. 724-725, fn. 5.)

4

before criminal investigations had been completed. In connection with the second waiver, signed by ALADS and the Department in July 2006, the Department agreed it would not use the exception as evidence of a modification of the 1991 settlement agreement or "claim that the Gates and Johnson Agreement is not in full force and effect." Nonetheless, in a December 2006 letter the Department informed ALADS it was "evaluating the ramifications of the Gates/Johnson settlement agreement" because it "is problematic and results in a time delay, which not only negatively affects the administrative investigation, it does a disservice to the employee, it lessens the timeliness and impact of any discipline, training, or other corrective action, and it has the potential for undermining public confidence in the efficiency and integrity of the Department." The letter concluded, effective January 1, 2007, the Department planned to begin interviewing deputies involved in hit shootings prior to the District Attorney's determination whether criminal charges should be filed.

The Department and ALADS exchanged correspondence for more than a year about the propriety of the Department deviating from the terms of the settlement agreement. Their representatives eventually met to discuss the matter in September 2008. In October 2008 the Department sent ALADS a proposal that administrative review of hit shootings would commence when results of the homicide bureau's investigation were submitted to the district attorney's office and administrative review of criminal allegations would commence when the criminal investigation was submitted to the prosecuting attorney to file charges—that is, at points earlier than specified in the settlement agreement. In a January 5, 2009 letter ALADS contended the settlement agreement was not subject to negotiation, but stated the Department's proposal had been forwarded "to the appropriate levels" for review. In a January 15, 2009 letter ALADS again stated the settlement agreement was not subject to negotiation, unilateral change or impasse.[2]

---

[2] An impasse arises in a labor negotiation when no agreement has been reached after notice and good faith bargaining. If there is no resolution after impasse procedures,

5

On August 26, 2009 the Department declared an impasse and advised ALADS it was changing its procedure effective October 1, 2009 to begin administrative review of (1) hit shootings when the shoot book prepared by the homicide bureau has been submitted to the district attorney's office; and (2) criminal allegations "at the time that the Department determines that the administrative investigation should begin. This determination will be made on an individual case-by-case basis. This means that the administrative investigation could commence simultaneously with the criminal investigation . . . when the criminal case is submitted to the prosecuting attorney for filing consideration, or when the criminal case is resolved." The Department reserved its right to delay the administrative investigation until completion of the criminal proceedings if criminal charges were filed.

On November 2, 2009 ALADS filed a complaint and on February 5, 2010 a first amended complaint against the Department, Los Angeles County and Sheriff Baca[3] for breach of contract and seeking specific performance of the terms of the 1991 settlement agreement, and for a declaration of the continuing validity of that agreement.

In September 2010 the Department moved for summary judgment, contending, because the settlement agreement had no express or implied provision for its duration, it was terminable at will by either party after a reasonable time had elapsed. Alternatively, the Department argued, (1) even if the agreement's duration could be inferred, it would be the same as the term for the permanent injunction—that is, the time it would have taken to adjudicate ALADS's unfair labor practice charge, estimated to be about five years; and (2) if the court were to find the parties had intended the agreement to be permanent, the settlement agreement was invalid because it impermissibly contracted

---

if applicable, have been exhausted, the employer has the right to unilaterally impose its last best offer. (See Gov. Code, § 3505.4.)

[3]     Because there is no reason to distinguish among the Department, Los Angeles County and Sheriff Baca, for ease of reference we generally refer to the defendants collectively as the Department.

away Los Angeles County's right to exercise its police powers. The trial court denied the motion.

### 2. *The Bench Trial*

#### a. *Trial testimony*

Trial was held over eight days in April, May and June of 2011 with testimony from, among others, Richard Shinee, the ALADS's general counsel for more than 30 years, and Jeffrey Hauptman, the Department's director of employee relations, the two men who had negotiated and signed the settlement agreement.[4] Acknowledging the settlement agreement lacked the precise words, Shinee testified the parties intended the procedures set forth in the settlement agreement to be followed until there was some change in how sworn deputies were investigated—for example, if a civilian oversight committee were to be tasked with the administrative investigation of deputies. Shinee essentially explained, if ALADS had prevailed only in the unfair labor practice proceeding,[5] it would have prompted a return to the pre-1987 practice and an order to bargain; following negotiations, the Department could again declare an impasse and unilaterally impose a policy change. Thus, ALADS was not willing to dismiss the civil rights action, in addition to the unfair labor practice charge, unless it obtained a more "permanent" resolution—that is, an agreement the Department could change its administrative interrogation policy only if the underlying circumstances changed. Although Shinee did not recall a specific discussion with Hauptman on this issue, he believed that was the "point of the settlement agreement. . . . I think we had to have that discussion by virtue of the give and take. We both engaged in negotiations for this final agreement."

---

[4]    Hauptmann worked for the Department as the director of employee relations or director of personnel, or sometimes both, from 1986 until his retirement in February 2000.

[5]    Shinee testified it could have taken up to five years to fully adjudicate the unfair labor practices charge.

7

Hauptman agreed the settlement agreement was intended to resolve both the unfair labor practice charge and the civil rights action by returning the parties to the status quo ante. However, although he and Shinee never discussed how long the settlement agreement was going to last, Hauptman insisted it was never his intention to permanently remove the timing of administrative interrogations for deputies from the mandatory bargaining process. Hauptman explained, "[P]hilosophically, I believe nothing is forever and I had an ongoing relationship with ALADS where we negotiated contract terms and other issues on an ongoing basis . . . . So, had something come up that would have driven us to request a [change] in this, I would have done it through the bargaining process."[6] Hauptman further testified he viewed the settlement agreement as "both a settlement agreement and a side letter. . . . Partially because it dealt specifically with a couple of individuals . . . , and it was a side letter agreement because it affected the whole class, potentially the whole class." Hauptman did not think the Department would be able to renegotiate the effect of the settlement agreement on the individual deputies; however, as to the class of deputies, he testified, "I believed we could have gone back to the bargaining table at some point in the future and say for lack of a better term this agreement is not working for us [and] you need to renegotiate its terms."

b. *The trial court decision in favor of the Department*

Relying largely on *Consolidated Theatres, Inc. v. Theatrical Stage Employees Union, Local 16* (1968) 69 Cal.2d 713 (*Consolidated Theatres*), the trial court found it could not infer a term limiting or defining the period of enforceability for the settlement agreement, which had no express sunset clause or method for termination. Accordingly,

---

6      As summarized by the trial court based on the trial testimony, "A Memorandum of Understanding (or 'MOU'), or a [s]uccessor MOU, relates to wages, hours and working conditions. It is negotiated every few years, and requires ratification by ALADS'[s] membership. The periods between MOUs or successor MOUs are bridged by extension agreements. During the year [s]ide [l]etters are entered into to address issues that arise during the term of an MOU. Side [l]etters can modify or clarify an MOU, or contain a new term or condition of employment, and are negotiated by ALADS'[s] Executive Director."

the court ruled, the agreement was terminable at the will of either party after a reasonable period of time, and the Department had properly terminated it.[7] (See *id.* at pp. 727, 728 [court can infer contract's duration "when the nature of the contract and surrounding circumstances afford a reasonable ground for such implication"; if nature of contract and surrounding circumstances "give no suggestion as to any ascertainable term," "term of duration shall be at least a reasonable time, and . . . the obligations under the contract shall be terminable at will by any party upon reasonable notice after such a reasonable time has elapsed"].) The court explained there was no meeting of the minds: "Mr. Shinee had a strong interest in not being immediately required to return to the bargaining table on this issue, and he articulated that interest to Mr. Hauptman during their discussions. However, during the negotiations, Mr. Shinee did not articulate that he understood or intended that the issue of the timing of compelled administrative interviews was to be entirely and forever removed from the ambit of collective bargaining, although that was ALADS'[s] position in its opening statement. Mr. Hauptman certainly believed that the issue remained subject to collective bargaining should either side conclude that the arrangement was not working satisfactorily for them. In addition, assuming there was some generalized reference to a 'change in circumstances,' the Court finds insufficient credible evidence to establish that there was any substantive discussion of what would constitute a change in circumstances, and certainly there was no meeting of the minds on that point. In fact, there was no evidence that either party sought to set forth any term of duration, or that either party sought to set forth any provision concerning the circumstances under which the parties could or could not revisit the issue."

The court additionally found the more than 15 years that had elapsed between execution of the 1991 settlement agreement and the Department's December 2006 letter indicating it intended to change the administrative interrogation policy was a "reasonable

---

[7]     The trial court issued a tentative decision on August 26, 2011. In response to ALADS's request for a statement of decision clarifying several issues, the court issued its final decision on September 20, 2011.

9

time for the agreement to have been in force." Because the Department had provided the Association with reasonable notice of termination, there was no breach of contract.

## DISCUSSION

1. *Principles of Contract Interpretation and Standard of Review*

Absent conflicting extrinsic evidence, the interpretation of a written contract is a question of law. (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; *Parsons,* at p. 865; see also Civ. Code, § 1636.) That intent is interpreted according to objective, rather than subjective, criteria. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126.) When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement. (Civ. Code, §§ 1638 ["language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"]; 1639 ["[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"].)

Contracts that fail to include an express provision defining their duration are not "fatally uncertain and indefinite. [Citations.] However, such omission does require that the duration of the contract be judicially determined in accordance with established rules of construction." (*Consolidated Theatres*, *supra*, 69 Cal.2d at p. 724.) "California courts have not hesitated to imply a term of duration when the nature of the contract and surrounding circumstances afford a reasonable ground for such implication." (*Id.* at p. 727; see *id.* at p. 725 [nature of contract and totality of circumstances may allow court "to determine that the obligations of the contract were impliedly conditioned as to duration upon the occurrence or non-occurrence of some event or situation"].) When a term of duration cannot be inferred, with some exceptions not applicable here, the law "implies that the term of duration shall be at least a reasonable time, and that the obligations under the contract shall be terminable at will by any party upon reasonable

10

notice after such a reasonable time has elapsed." (*Id.* at pp. 727-728; see *McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 966 ["court may limit a contractual duty to a judicially determined 'reasonable time' only after other tools of construction have failed to establish an *intended* duration"].)

When "the extrinsic evidence relating to the contemplated duration" of an agreement is not in conflict, we independently review the issue of the agreement's term. (*Consolidated Theatres*, *supra*, 69 Cal.2d at p. 724.) "[T]he fact that conflicting inferences may be drawn from *evidence which is not itself in conflict* does not require that an appellate court accept the trial court's interpretation of the instrument based upon such evidence." (*Id.* at p. 724, fn. 11.)

2. *The Circumstances Surrounding Adoption of the 1991 Settlement Agreement Support the Inference It Was To Continue in Effect Unless Modified by Mutual Consent or the Underlying Conditions Changed*

The Supreme Court in *Consolidated Theatres* emphasized, in construing contracts that call for continuing performance or forbearance but contain no express provision defining their duration, a court's first obligation "must always be that of implying a term of duration commensurate with the intentions of the parties." (*Consolidated Theatres, supra,* 69 Cal.2d at p. 727.) "[I]n some cases the court by referring to the nature of the contract and the totality of circumstances is able to determine that the obligations of the contract were impliedly conditioned as to duration upon the occurrence or non-occurrence of some event or situation." (*Id*. at p. 725; see *Lura v. Mutaplex, Inc.* (1982) 129 Cal.App.3d 410, 414-415 ["[t]he important factor, then, is not whether the contract fails to specify a termination date, but whether there is an ascertainable event which necessarily implies termination"].) Only if the nature of the contract itself and the totality of the circumstances surrounding it "give no suggestion as to any ascertainable term" does the court properly impose an implied term permitting termination after "at least a reasonable time . . . ." (*Consolidated Theatres,* at p. 727; see *McCaskey v. California State Automobile Assn., supra*, 189 Cal.App.4th at p. 966 ["[u]nder *Consolidated Theatres*, and the principles enumerated there, a court may limit a contractual duty to a

11

judicially determined 'reasonable time' only after other tools of construction have failed to establish an *intended* duration"].)

*Consolidated Theatres* involved disputes spanning more than 30 years between a company that owned and operated motion picture theatres and a union for musicians providing live accompaniment for silent films. In 1931 Consolidated Theatres settled the first dispute with the union over whether it could eliminate the services of the musicians as films began to include sound tracks. (*Consolidated Theatres*, *supra*, 69 Cal.2d at p. 717.) The agreement provided Consolidated would be required to employ one stage hand "if any stage presentations are offered for the public" at one of the theaters it owned. (*Id.* at p. 718.) In 1963 another dispute arose between the parties, raising the issue whether the 1931 agreement was still in effect. The Court held it was not: "[I]t was the intention of the parties contracting in 1931 to create reciprocal obligations binding upon them as long as there existed a real possibility that the theatres owned and operated by Consolidated might undertake to present live stage performances—and no longer." (*Id.* at p. 730.) Since there was no realistic possibility of live performances in 1963, the Court held the contract was no longer binding on the parties. (*Ibid.*)

As ALADS contends, the circumstances here fully support the inference the parties did not intend the 1991 settlement agreement only to resolve a dispute concerning a mandatory subject of collective bargaining, subject in the future to all the rules regarding renegotiation, including the right of the Department to unilaterally impose a changed procedure if an impasse was properly declared. As the agreement itself expressly stated, it "completely settled" both the pending unfair labor practice charge and the civil action, which alleged the Department's new interview rules violated not only its obligation to bargain with ALADS but also the constitutional rights of sheriff's deputies. Settlement of the labor relations issues alone could reasonably be interpreted to be

12

subject to on-going review under normal bargaining rules; not so resolution of the civil action.[8]

Although Shinee and Hauptman did not discuss how long the settlement agreement would remain in effect, their testimony at trial demonstrates they both understood the purpose of the agreement was not simply to vindicate ALADS's right to bargain about conditions of employment but also to protect individual deputy sheriffs subject to pending criminal investigations from being interrogated administratively and having their compelled statements potentially used by the district attorney's office in deciding whether to file charges. (See generally *Lura v. Mutaplex, Inc., supra,* 129 Cal.App.3d at p. 412 [finding an ascertainable term could be inferred by court even though "[t]he parties neither discussed nor reached an understanding as to the duration of the agreement"].) Indeed, Hauptman conceded he always understood the agreement could not be modified as to the named deputies—their constitutional claims transcended a normal labor-management dispute. And the Department itself complied with all provisions of the settlement agreement for 15 years without raising concerns that the timing of administrative interrogations was problematic or resulted in deleterious delays, issues that would have existed in 1991 and at all times thereafter. To the contrary, when confronted with serious public relations issues involving incidents of suspected criminal misconduct by deputies in 2005 and 2006, the Department requested—and received—

---

[8]     The civil complaint asserted, in part, that ordering Deputies Gates and Johnson to participate in an administrative interrogation during the pendency of criminal proceedings under penalty of job forfeiture undermined the lawyer-client privilege and threatened their constitutional right to effective assistance of counsel, as well as denying them equal protection of the law. Presumably ALADS could not make similar constitutional claims on behalf of itself or its members based on an order to respond to questions during an internal administrative investigation following a deputy's arraignment on criminal charges, as authorized by the 1991 settlement agreement. This additional aspect of the settlement agreement, resolving a dispute not grounded in a normal labor relations issue, distinguishes the case at bar from *City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 72, in which the court, quoting out-of-state authority, held, "'Labor contracts of indeterminate duration or ones that do not provide a manner of termination are terminable at will.'"

13

waivers of the timing protocol from ALADS, while reaffirming the continuing validity of the 1991 settlement agreement itself. This predispute, postcontracting conduct reinforces our conclusion both parties understood the settlement agreement fully resolved the issue of the timing of administrative interrogations of deputies being investigated for criminal misconduct for so long as the deputy was subject to loss of his or her job for refusing to respond to internal, pre-arraignment questioning. (See *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 753 ["'[t]he acts of the parties under the contract afford one of the most reliable means of arriving at their intention . . .'"]; accord, *Wolf v. Walt Disney Pictures & Television, supra,* 162 Cal.App.4th at pp. 1133-1134.)

This construction of the settlement agreement does not mean, as the trial court suggested, it would continue in perpetuity. First, like any agreement between two parties it could be revised by mutual consent. The question is not whether the Department and ALADS could renegotiate the agreement (for example, agreeing to permit administrative interrogations while the criminal investigation was ongoing in officer-involved shooting cases in which a citizen was seriously injured but prohibiting them entirely in all other situations), but whether, having failed to reach a new or modified agreement, the Department could unilaterally impose its "last best offer." Second, the 1991 settlement agreement was impliedly conditioned as to duration upon the continued threat to the deputies' constitutional rights implicated by administrative interrogation of deputies concurrently the subject of a criminal investigation arising from the same incident, the issue raised in the civil action: If the circumstances animating ALADS's original civil rights claim on behalf of individual deputies changed—if, for example, the manner in which administrative investigations are conducted was significantly altered, as talkies replaced silent movies—then the mutual obligations created by the 1991 settlement agreement would terminate. (See *Consolidated Theatres*, *supra*, 69 Cal.2d at p. 730 [the parties' agreement "was impliedly conditioned as to duration upon the continued possibility of live state presentations . . . [;] the disappearance of that possibility terminated all obligations under the contract"].)

14

3. *The Settlement Agreement Is Not Void or Unenforceable*

As an alternative to arguing the 1991 settlement agreement was no longer binding because it had terminated upon reasonable notice after a reasonable time, the Department asserts under ALADS's construction the agreement constitutes an impermissible contracting away of its right to exercise police powers and, therefore, is invalid as against public policy (or ultra vires). (See *Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 800 ["the government may not contract away its right to exercise the police power in the future"]; accord, *Summit Media LLC v. City of Los Angeles* (2012) 211 Cal.App.4th 921, 934-935.) In its view, the right to promptly investigate its own deputies to ensure they are fit to serve as peace officers falls within the County of Los Angeles's broad police power, and the settlement agreement, as we and ALADS construe it, unduly interferes with that authority. The Department also contends the settlement agreement as interpreted—that is, impliedly conditioned as to duration upon the continued threat to deputies' rights created by concurrent administrative interrogation and criminal investigation—would have required approval by the Los Angeles County Board of Supervisors, and ALADS presented no evidence that any such approval had been obtained or that Hauptman otherwise had the authority to enter into such an agreement. Neither argument has merit.

As to the first point, nothing in the provisions of the 1991 settlement agreement prevents the Department from conducting an administrative investigation into alleged criminal misconduct by a deputy, including interviewing witnesses and obtaining a voluntary statement from the officer involved. The agreement restricts only the timing of a compelled administrative interrogation of a deputy concurrently subject to a criminal investigation. Similarly, as the Department's counsel conceded in the trial court, the agreement does not in any way limit the Department's ability to impose appropriate interim disciplinary measures without first interviewing the accused deputy. Thus, without questioning the legal principle advanced by the Department, we reject its public policy/ultra vires argument because it has failed to demonstrate the 1991 settlement

15

agreement's limited control over the timing of officer interviews impairs in any way its ability to safeguard the public or regulate its personnel.

As to the second point, the trial court found, and we agree, Hauptman's testimony was sufficient to establish both his actual and ostensible authority to negotiate and execute the 1991 settlement agreement. To be sure, as the Department explains, Government Code section 23005 provides a county may only exercise its powers through the Board of Supervisors, and Government Code section 25203 places direction and control of litigation with the Board, which may retain outside counsel or county counsel to perform this duty. The Los Angeles County Charter, in turn, provides county counsel shall have exclusive control of all civil actions in which the county or any of its officers is a party. Yet the Department concedes Hauptman had the authority to enter into the 1991 settlement agreement, as it interprets it, without the formal approval of the Board of Supervisors or county counsel and treated the agreement as valid and enforceable for 18 years. In light of our conclusion the agreement does not impermissibly impair the County's police powers, we fail to see how the post hoc dispute between the Department and ALADS over the implied provision for termination undermines Hauptman's authority. He had it.

Finally, notwithstanding the holdings in cases such as *First Street Plaza Partners v. City of Los Angeles* (1998) 65 Cal.App.4th 650, 667-669, limiting the doctrine of estoppel in government contract cases when specific requirements of a city charter have not been satisfied,[9] we agree with the trial court under the circumstances here—where both parties acted for nearly two decades under the terms of the agreement negotiated and

_____

[9]     In *First Street Plaza Partners* the alleged contract violated a provision in the city charter requiring all contracts be in writing, approved by the city attorney and city council and signed by the mayor. The court held the city could not be estopped to deny the formation of a contract that did not satisfy those specific requirements of the charter. (*First Street Plaza Partners v. City of Los Angeles, supra*, 65 Cal.App.4th at pp. 667-668.) "When there has been no compliance with the relevant charter provision, the city may not be liable in quasi-contract and will not be estopped to deny the validity of the contract." (*San Francisco Internat. Yachting etc. Group v. City and County of San Francisco* (1992) 9 Cal.App.4th 672, 683-684.)

signed by Shinee and Hauptman—the Department is estopped from now challenging Hauptman's authority to enter into the 1991 settlement agreement. "'[T]he doctrine of equitable estoppel may be applied against the government where justice and right require it. [Citation.]' [Citations.] Correlative to this general rule, however, is the well-established proposition that an estoppel will not be applied against the government if to do so would effectively nullify 'a strong rule of policy, adopted for the benefit of the public . . . .' [Citation.] The tension between these twin principles makes up the doctrinal context in which concrete cases are decided." (*Long Beach v. Mansell* (1970) 3 Cal.3d 462, 493.) "The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*Id.* at pp. 496-497; accord, *Medina v. Board of Retirement* (2003) 112 Cal.App.4th 864, 868-869.)

As discussed, no strong public policy would be violated by the enforcement of the 1991 settlement agreement according to its terms for as long as the circumstances that led to its adoption persist. We are not dealing with a public works contract, and no expenditure of public funds is involved; nor does applying estoppel directly contravene statutory limitations on the county's authority. (See *Medina v. Board of Retirement, supra*, 112 Cal.App.4th at p. 869.) Accordingly, even if Hauptman should have submitted the agreement to the Board of Supervisors for approval, that omission does not, at this late date, justify declaring the settlement agreement void ab initio.

17

## DISPOSITION

The judgment is reversed and the cause remanded to the superior court with directions to declare the continuing validity of the 1991 settlement agreement and to order such further relief as appropriate in light of the parties' continuing obligations under that agreement. ALADS is to recover its costs on appeal.


PERLUSS, P. J.


We concur:


ZELON, J.


SEGAL, J.[*]

---

[*]   Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.